Boyko TANOV, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, UNITED STATES DEPARTMENT OF JUSTICE, Respondent.

Docket No. 03–4321.

United States Court of Appeals, Second Circuit.

Argued: March 8, 2006.

Decided: April 4, 2006.

Neil Afran (H. Raymond Fasano, Marianne Artusio on the brief), Huntington, New York, for Petitioner–Appellant.

Kirti Vaidya Reddy, Assistant United States Attorney, (Michael J. Garcia, United States Attorney for the Southern District of New York, Sara L. Shudofsky, Assistant United States Attorney, on the brief), New York, New York, for Respondent–Appellee.

Before: MESKILL, POOLER, and HALL, Circuit Judges.

HALL, Circuit Judge.

Boyko Tanov ("Petitioner") arrived in the United States on May 25, 1990, conceded excludability through counsel, and was placed in exclusion proceedings. In a 1991 decision an immigration judge ("IJ") found Petitioner excludable from the United States, but granted his application for asylum and withholding of deportation. The Immigration and Naturalization Service ("INS") appealed, and the Board of Immigration Appeals ("BIA") reversed the IJ's decision because Petitioner had failed to establish past persecution or a well-founded fear of future persecution. Six years later, after the passage of the Nicaraguan Adjustment and Central American Relief Act of 1997 ("NACARA"), Pub.L. No. 105–100, Title II, 111 Stat. 2193 (1997), Petitioner moved to reopen his exclusion proceedings, asserting that he was entitled to suspension of deportation under section 203 of NACARA. The IJ granted Petitioner's motion to reopen but later denied his application for suspension of deportation. The BIA affirmed the IJ's decision without opinion.

For the reasons set forth below, we affirm the decision of the BIA and deny the petition.

## I. Background

Petitioner, a citizen of Bulgaria, arrived in the United States in 1990 without a valid and unexpired immigrant visa. The INS detained and interviewed him at the airport. Petitioner filed a timely application for asylum and withholding of deportation based upon his alleged opposition to the Communist Party. He filed a second,

amended application for asylum in October, 1990 asserting that he belonged to a political action group which the Bulgarian secret police had dissolved. The purpose of the group, he claimed, was to alert the world about Bulgaria's human rights violations, persecution of innocent people, and repressive conditions. Petitioner also claimed that the police continually harassed him due to his political beliefs and that authorities had repeatedly interrogated and threatened him and his family. He also said he was not allowed to practice his religion openly in Bulgaria.

At his hearing before an IJ in early 1991, in addition to making the representations noted above, Petitioner described being beaten by the police for two days in 1988 and being threatened every two or three months thereafter. The IJ granted asylum to Petitioner and issued him an I–94, ruling that "there is enough evidence to indicate that he has participated in anti-government activities in the past and that he has been questioned and detained for those reasons by the current government."

The INS appealed, and the BIA reversed the IJ's decision because Petitioner had failed to establish past persecution or a well-founded fear of future persecution. The BIA noted that the former government in Bulgaria had been overthrown in 1989 and the Bulgarian Communist Party had since renounced one-party rule. The BIA did "not believe that a reasonable person in [Petitioner's] circumstances would fear persecution for one of the five grounds specified in the Act." The BIA ordered Petitioner excluded from the United States. Petitioner did not seek review of that decision in this Court.

In 1994, almost three years after being excluded, Petitioner filed a motion with the BIA seeking reconsideration of its 1991 decision. The BIA denied the motion to reconsider. Once again, Petitioner did not seek review from this Court. Although ordered excluded, Petitioner never left the United States.

On November 19, 1997, Congress passed NACARA, which permitted certain qualified aliens from Bulgaria and other designated countries the opportunity to apply for suspension of deportation. Believing that NACARA made him eligible for suspension of the exclusion and deportation that had been ordered by the BIA almost seven years earlier, petitioner filed a motion to reopen his immigration proceedings seeking that suspension. The INS opposed the motion, arguing that NACARA applied only to aliens deportable from the United States, not those who were excludable. In November, 1998 the IJ granted Petitioner's motion to reopen and denied the relief sought. The BIA affirmed without opinion the IJ's decision to deny suspension of deportation under NACARA. Although Petitioner received an extension of time to file a brief in support of his appeal to the BIA on this point, he never did so. He subsequently filed this petition.

Regarding his asserted right to remain in this country, Petitioner makes three arguments. First, he contends that as an excludable alien, i.e., one who is detained while attempting to enter the United States and given special permission to remain here pending a determination of his right to enter, he is eligible to obtain suspension of deportation under NACARA. Next, he argues that he was in fact "admitted" into the United States as that term has been used in the Immigration and Nationality Act of 1952 ("INA") because he was "inspected, admitted, and paroled into the United States" on several occasions. Having been "admitted," he is not barred from consideration for suspension of deportation. Finally, Petitioner argues that NACARA's distinction between ex-

cludable and deportable aliens is irrational and fails to comport with the Equal Protection Clause.

## II. Standard of Review

 Where, as here, the BIA has summarily adopted or affirmed the IJ's decision without opinion, this court reviews the IJ's decision. *Twum v. INS,* 411 F.3d 54, 58 (2d Cir.2005). We review de novo the BIA's application and interpretation of law. *Diallo v. INS,* 232 F.3d 279, 287 (2d Cir.2000). With respect to appellant's claim that NACARA violates his Fifth Amendment equal protection rights, this Court applies the rational basis test. *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *see also Jankowski–Burczyk v. INS,* 291 F.3d 172, 178 (2d Cir.2002) (distinctions drawn between "similarly situated" groups of aliens are subject to rational basis review).

## III. Discussion

### A. Petitioner is ineligible for relief under NACARA

When Petitioner first arrived and sought admission into the United States, the INA governed immigration proceedings. Section 244 of the INA provided the Attorney General with the discretionary authority to suspend the deportation of certain qualified aliens. In order to be eligible for suspension of deportation, an alien had to meet requirements related to continuous presence in the United States, good moral character, and hardship resulting from deportation. *See* 8 U.S.C. § 1229b. When Petitioner arrived in this country in 1990, however, he was ineligible for this suspension because he was in exclusion proceedings and later ordered excluded from the United States. *See Leng May Ma v. Bar-*

*ber,* 357 U.S. 185, 189–90, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) (noting that suspension of deportation has never been made available to aliens ordered excluded); *see also Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–76 & n. 31, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (discussing the distinction between "deportable" and "excludable" aliens). Although Petitioner was paroled into the United States pending the completion of his exclusion proceedings, which is oftentimes the case with excludable aliens, such parole is not "regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A) (1994); *see also Leng May Ma,* 357 U.S. at 188, 78 S.Ct. 1072.

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, Div. C., Title III–A, 110 Stat. 3009–546 (1996). Among other things, on its April 1, 1997 effective date, IIRIRA eliminated the distinction between excludable and deportable aliens and replaced the suspension of deportation provision of INA § 244 with "cancellation of removal," a new form of discretionary relief available to all aliens. *See* 8 U.S.C. § 1229b; *Simeonov v. Ashcroft,* 371 F.3d 532, 535 (9th Cir.2004). IIRIRA also implemented a new "stop-time" rule. Under that rule, for purposes of calculating an alien's continuous presence in the United States, and thus determining whether the alien had been here long enough to be eligible for suspension of deportation, the time would stop accruing "when the alien was served with a notice to appear or when the alien committed certain offenses." *Sherifi v. INS,* 260 F.3d 737, 741 (7th Cir.2001). Notably, IIRIRA was prospective in its outlook. It did not affect those aliens who were already excludable [1]

---

1. We do not draw a distinction here between aliens who are in exclusion proceedings, those who have been excluded, and those who are excludable.

under the pre-IIRIRA scheme, nor did it change the eligibility requirements applicable to them for suspension of deportation. *Patel v. McElroy,* 143 F.3d 56, 60 (2d Cir.1998) (holding that "[a]s a matter of statutory construction ... for aliens placed into proceedings prior to IIRIRA's effective date, suspension of deportation under former INA section 244 is available to aliens in deportation but *not in exclusion proceedings* " (emphasis added)).

Later in 1997 Congress enacted NACARA, in part to prevent the mass deportation of aliens who had arrived from some former Soviet bloc and Central American nations. *See Romero v. U.S. INS,* 399 F.3d 109, 112 (2d Cir.2005) (citing *Ram v. INS,* 243 F.3d 510, 517 (9th Cir.2001) (explaining that aliens from the NACARA countries took unusual risks in escaping oppressive regimes and war-torn countries)). Among other things, NACARA § 203 amended IIRIRA "to permit qualified aliens from certain countries placed in [deportation] proceedings before, on, or after April 1, 1997, to apply for 'special rule' protection from deportation .... This special rule relief provide[d] the more generous pre-IIRIRA suspension of deportation remedy." *Simeonov,* 371 F.3d at 536 (internal quotation marks omitted). Under NACARA, eligible aliens were exempted from the application of IIRIRA's stop-time rule *"regardless of whether the alien is in exclusion or deportation proceedings* before" IIRIRA's effective date. IIRIRA § 309(c)(5)(C)(I), as amended by NACARA § 203 (emphasis added); *see also Simeonov,* 371 F.3d at 536.

■ Focusing on this language related to the suspension of IIRIRA's stop-time rule, Petitioner posits that he is entitled to suspension of deportation under NACARA § 203 despite having been ordered excluded years before the effective dates of both IIRIRA and NACARA. His argument is

without merit. Although in *Patel* we held that IIRIRA did not change the eligibility requirements for suspension of deportation, making it available only to those subject to deportation and not exclusion under the INA, we have not yet addressed whether NACARA changes those eligibility requirements. We now join other Circuits that have done so. We hold that aliens paroled into this country who are in exclusion proceedings continue to be ineligible for suspension of deportation under NACARA.

In *Simeonov,* the Ninth Circuit considered the appeal of a Bulgarian citizen who in 1991 was ordered excluded and deported from the United States. 371 F.3d at 534. After discussing the "pre-IIRIRA statutory scheme," the court held that petitioner was ineligible for suspension of deportation:

> NACARA did not undermine these well-established precedents. The purpose of NACARA is not to alter the legal landscape by creating a remedy of suspension of deportation for persons paroled into the United States and subject to a final order of deportation.
>
> . . . .
>
> Thus, even if [petitioner] were to satisfy the requirements of NACARA § 203, he is nevertheless ineligible for suspension of deportation because he never legally entered the United States and is subject to a final order of deportation.

*Id.* at 537. The *Simeonov* court also noted that, like Petitioner in this case, "[o]ne fundamental problem with [petitioner's] argument is that IIRIRA and the transitional rules are inapplicable to [him] because his exclusion order became final years before IIRIRA's effective date." *Id.* at 536. The court further explained that Congress's purpose in enacting NACARA was to grant procedural relief to qualified aliens so they would not be affected by

IIRIRA's stop-time rule, not so that individuals like Simeonov, and Petitioner Tanov in this case, could suspend their deportation. *Id.* at 537.

In *Sherifi*, the Seventh Circuit similarly examined the applicability of NACARA § 203 to an individual ordered excluded from the United States prior to April 1, 1997. 260 F.3d at 738. Sherifi argued that "NACARA changed the landscape for aliens in exclusion proceedings, rendering them eligible to apply for suspension of deportation." *Id.* at 739. The court disagreed, holding that "by its own terms, [NACARA § 203] is limited to the purpose of calculating the period of continuous physical presence in the United States.... Nothing in NACARA changed the well-established rule that aliens in exclusion proceedings are not entitled to suspension of deportation." *Id.* at 741–42.

Finally, in *Fieran v. INS*, 268 F.3d 340 (6th Cir.2001), the Sixth Circuit also found that the petitioner was ineligible for suspension of deportation because he was ordered excluded "long before the effective date of the IIRIRA." *Id.* at 346.

We join our sister Circuits today in holding that NACARA, like IIRIRA, did not change the legal landscape with regard to the well-established rule that aliens ordered excluded prior to IIRIRA's effective date are not entitled to suspension of deportation. Importantly, it was IIRIRA, not NACARA, that removed the distinction between the terms "deportable" and "excludable" and created cancellation of removal as a form of relief. As we held in *Patel*, IIRIRA did not change the law to make suspensions of deportation available to aliens ordered excluded prior to its passage. For the same reasons, because NACARA only affects whether certain elapsed time is counted toward an alien's eligibility for suspension of deportation, NACARA does nothing to change the eli-

gibility of an alien determined to be excludable prior to the enactment of IIRIRA.

Petitioner places undue emphasis on certain language in NACARA referring to "exclusion proceedings," which he believes entitles him to suspension of deportation. That language—"regardless of whether the alien is in exclusion or deportation proceedings"—does not support his claim. He ignores the context of this language and therefore fails to appreciate that it is inapplicable to his circumstances. The plain language of NACARA is clear that it applies only to modify the provision of IIRIRA which stops time running for those aliens who otherwise meet the eligibility requirements. The BIA properly denied Petitioner's request for suspension of deportation under NACARA.

**B.  Petitioner was never "admitted" into the United States**

■ Petitioner's second argument to this Court is that he should be deemed admitted into the United States and thus eligible for suspension of deportation. Petitioner argues that because the government issued him an I–94 document upon the IJ's initial grant of asylum in 1991, and also because an I–94 is "tantamount to inspection and parole," he has been admitted to the United States for purposes of deportation or removal proceedings. In his appeal to the BIA from the IJ's denial of relief, Petitioner did not file a brief. His two-sentence notice of appeal to the BIA read:

> NACARA regulations don't allow aliens in exclusion relief under NACARA statute. Respondent is in exclusion and is [sic] denied relief by the IJ Page, NACARA statute does provide for relief for aliens in exclusion.

Because Petitioner did not raise before the BIA the issue of whether he was "admit-

ted" into the United States by virtue of his having received an I–94 document, he has waived that argument to this Court. *See* 8 U.S.C. § 1252(d)(1); *see also Cervantes–Ascencio v. U.S. INS*, 326 F.3d 83, 87 (2d Cir.2003) (noting that "exhaustion requirements" mandate that petitioners "raise issues to the BIA in order to preserve them for judicial review"); *Gill v. INS*, 420 F.3d 82, 86 (2d Cir.2005) (noting that the consideration of bases for relief and of general issues that were not raised below is barred). Even if we consider the substance of this argument, however, it is meritless.

■ An alien who is properly admitted into the United States—either based on valid documentation or for humanitarian reasons—is issued an I–94 document "as evidence of the terms of admission." 8 C.F.R. § 235.1(f). Here, in 1991 the IJ granted Petitioner asylum and issued him an I–94. Without the BIA's affirmance, however, an IJ's determination is not a final agency order. *See Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 89 (2d Cir.2001); *see also* 8 U.S.C. § 1101(a)(47)(B) (defining "final order" as "(i) a determination by the [BIA] affirming such order; or (ii) the expiration of the period in which the alien is permitted to seek review of such order by the [BIA]"). The INS timely appealed the IJ's decision granting Petitioner asylum; the BIA reversed the IJ and ordered Petitioner excluded. Accordingly, Petitioner could not be deemed admitted into the United States as a result of the issuance of the I–94 because there was never a final agency order granting him admission.

Moreover, Petitioner's contention that the I–94 is "tantamount to inspection and parole" does not further his cause.

> For over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an

entry though the alien is physically within the United States.

. . . .

> The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed [him] legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court.

*Leng May Ma*, 357 U.S. at 188, 190, 78 S.Ct. 1072; *see also* 8 U.S.C. § 1182(d)(5)(A). Even if Petitioner is correct that an I–94 is "tantamount to inspection and parole," he still was never admitted into the United States because inspection and parole is a mere administrative device that does not confer admission. *Id.*

## C. NACARA Comports with the Equal Protection Clause

■ Likewise without merit is Petitioner's argument that NACARA violates the Equal Protection Clause because it draws an irrational distinction between excludable and deportable aliens. This Court's review of legislation on immigration is "limited," *Azizi v. Thornburgh*, 908 F.2d 1130, 1133 (2d Cir.1990), and the scope of review of an immigration equal protection claim is "exceedingly narrow," *Correa v. Thornburgh*, 901 F.2d 1166, 1173 (2d Cir.1990). Distinctions among "similarly situated" groups of aliens are subject to rational basis review. *Jankowski–Burczyk*, 291 F.3d at 178. Under the rational basis standard, appellant must demonstrate that the government regulation is arbitrary and/or unreasonable, and not rationally related to a legitimate government interest. A sufficient reason "need not be

one actually considered by Congress." *Domond v. U.S. INS.*, 244 F.3d 81, 87 (2d Cir.2001).

We have previously addressed this issue and found there to be no violation of equal protection. In *Skelly v. INS*, 168 F.3d 88 (2d Cir.1999), we concluded that "[i]t is not difficult to conceive of legitimate and bona fide reasons why former § 244(a)(1) might provide differing available procedures to aliens in exclusion proceedings and aliens in deportation proceedings." *Id.* at 91. Such a legitimate and bona fide reason is all that is required in order to pass constitutional muster. *See id.* (citing *Fiallo*, 430 U.S. at 792, 97 S.Ct. 1473). We based this holding on the fact that

> Congress evidently made the logical determination that, as a class, aliens in deportation proceedings—i.e., aliens who have already entered the country—are more likely than aliens in exclusion proceedings—i.e., aliens [like Petitioner] who are detained while entering the country—to present the circumstances under which the Attorney General may exercise her discretion to suspend deportation.

*Id.* Acknowledging that this "distinction . . . appears simply to be a permissible legislative generalization born of the legitimate aim of saving resources," *id.*, we noted:

> Even though the generalization may not apply in [petitioner's] exact case and even though there may be more precise generalizations Congress could have chosen, those circumstances alone do not suggest an equal protection violation in this case. Just as a particularly mature fourteen-year-old could not argue successfully that a state's minimum driving age violates the equal protection clause,

so is [petitioner] precluded from making a similar argument about former § 244(a)(1).

*Id.* at 92. The reasons that required this Court to reject an equal protection challenge to IIRIRA in *Skelly* likewise compel us to reject Petitioner's argument here.

## IV. Conclusion

For the reasons set forth above the petition from the decision of the BIA is DENIED.