06-4921-cv
Estate of Landers v. Leavitt

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2007

(Argued: May 7, 2008                          Decided: October 1, 2008
                                              Revised: January 15, 2009)

Docket No. 06-4921-cv

_____

ESTATE OF MARION LANDERS, as represented by its executor,
RICHARD LANDERS, MARION A. DIXON, and MURIEL GRIGLEY,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellants-Cross-Appellees*,

-v.-

MICHAEL O. LEAVITT,
Secretary of the Department of Health and Human Services,
*Defendant-Appellee-Cross-Appellant.*

_____

Before:       HALL and LIVINGSTON, *Circuit Judges*.[*]

Medicare participants brought this putative class action challenging denial

of coverage for post-hospitalization care in skilled nursing facilities. The United

States District Court for the District of Connecticut (Janet C. Hall, J.), certified

---

[*] The Honorable Louis F. Oberdorfer, District Judge, United States District Court for the District of Columbia, who was originally a member of the panel, recused himself after oral argument and had no role in the preparation of this decision. Because the remaining members of the Panel are in agreement, we decide this case in accordance with Second Circuit Interim Local Rule § 0.14(b).

the class, 232 F.R.D. 42, and then granted summary judgment to the defendant, 2006 WL 2560297, holding that the plaintiffs were not entitled to Medicare coverage because the durations of their hospitalization did not meet the statutory qualifying stay requirement. We hold that the interpretation of the qualifying stay requirement set forth in the government's Medicare Benefit Policy Manual is not entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), but we nevertheless find the government's interpretation of the statute persuasive and adopt it.

Affirmed.

GILL DEFORD, Willimantic, Conn. (Judith A. Stein, Brad S. Plebani, Wey-Wey Kwok, Willimantic, Conn., Sally Hart, Tucson, Ariz., Toby Edelman, Washington, D.C., *on the brief*), Center for Medicare Advocacy, *for Plaintiffs-Appellants-Cross-Appellees.*

LEWIS S. YELIN, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, D.C. (Scott R. McIntosh, Attorney, Appellate Staff, Peter D. Keisler, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., Kevin J. O'Connor, United States Attorney for the District of Connecticut, *on the brief*), *for Defendant-Appellee-Cross-Appellant.*

Carol C. Loepere (Elizabeth A. Ransom, *on the brief*), Reed Smith LLP, Washington, D.C., *for Amici Curiae American Health Care Association*, *Alliance for Quality Nursing Home Care*, *American Association of Homes and Services for the Aging*, *National Association of Professional Geriatric Care Managers*, *Catholic Health Association of the United States*, *National Association for the Support of Long Term Care*, *and National Association of Health Care Assistances in Support of*

2

*Plaintiffs-Appellants-Cross-Appellees.*

Stuart R. Cohen, AARP Foundation Litigation (Bruce Vignery, Stacy Canan, AARP Foundation Litigation, Michael Schuster, AARP, *on the brief*), Washington, DC, *for Amici Curiae AARP, Alliance for Retired Americans, California Advocates for Nursing Home Reform, Greater Boston Legal Services, Long-Term Care Community Coalition, Medicine Rights Center, Michigan Campaign for Quality Care, NCCNHR, and National Senior Citizens Law Center in Support of Plaintiffs-Appellants-Cross-Appellees.*

LIVINGSTON, *Circuit Judge*:

In this case — a dispute about how to count to three — the plaintiffs-appellants are Medicare beneficiaries who appeal from a grant of summary judgment of the United States District Court for the District of Connecticut (Hall, J.). Each of them spent at least three days in the hospital but was discharged less than three days after having been formally admitted, and each sought coverage under Part A of the Medicare program for a post-hospitalization nursing home stay. After their claims for coverage were initially denied, they brought this lawsuit challenging the denial. The district court granted summary judgment for the government, holding that the plaintiffs were not entitled to Medicare reimbursement because they had not spent the requisite amount of time as hospital inpatients. We agree and therefore affirm.

## BACKGROUND

3

"Medicare is the federal government's health-insurance program for the elderly." *Conn. Dep't of Soc. Servs. v. Leavitt*, 428 F.3d 138, 141 (2d Cir. 2005). It contains four distinct programs, the first of which, known as "Part A," is a hospital insurance program. *See* 42 U.S.C. §§ 1395c to 1395i-5. Part A "provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care" for, among others, eligible people over 65 years of age. *Id.* § 1395c; *see also id.* § 426 (establishing the entitlement to Part A benefits). "Under Part A, service providers such as hospitals are paid the lesser of the 'reasonable cost' of covered services provided to program beneficiaries or 'the customary charges with respect to such services,' and agree not to charge beneficiaries for these services." *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 73 (2d Cir. 2006) (citations omitted) (quoting 42 U.S.C. § 1395f(b)(1)); *see also Kraemer v. Heckler*, 737 F.2d 214, 215-16 (2d Cir. 1984) (describing the basic categories of services covered by Part A).

The entitlements under Part A include an extended care benefit, which provides coverage for "post-hospital extended care services for up to 100 days during any spell of illness." 42 U.S.C. § 1395d(a)(2). Part A does not cover all extended care services that follow hospital stays, however. Rather, Part A requires that the hospital stay be a "qualifying" hospital stay before it covers the subsequent extended care. Specifically, the statute defines "post-hospital

4

extended care services" to mean "extended care services furnished an individual after transfer from a hospital in which he was an inpatient for not less than 3 consecutive days before his discharge from the hospital in connection with such transfer." *Id.* § 1395x(i). In turn, it defines "extended care services" to mean "services furnished to an inpatient of a skilled nursing facility." *Id.* § 1395x(h). These services include nursing care, bed and board, physical and occupational therapy, and drugs. *Id.* If post-hospital extended care services are not covered by Part A, they still may be covered by Part B. Part B is a voluntary program, however, and unlike Part A beneficiaries, Part B enrollees must pay a monthly premium. *Matthews v. Leavitt*, 452 F.3d 145, 146 n.1 (2d Cir. 2006); *Conn. Dep't of Soc. Servs.*, 428 F.3d at 141 n.2; *Furlong v. Shalala*, 238 F.3d 227, 229 (2d Cir. 2001).

Marion Landers, Marion Dixon, and Muriel Grigley, the first of whom is now deceased and is represented here by her estate, were Medicare beneficiaries who each received inpatient hospital care followed by care at a skilled nursing facility, or "SNF" — essentially, a nursing home. *See* 42 U.S.C. § 1395i-3(a) (defining SNF). Each of them spent three consecutive days in the hospital before moving to the SNF. Yet the Centers for Medicare and Medicaid Services ("CMS") — the federal agency situated within the Department of Health and Human Services ("HHS") that administers the Medicare program on behalf of

5

the Secretary of HHS[1] — denied their claims for coverage with respect to their post-hospitalization SNF stays. CMS did so in accordance with its own rules for determining whether a patient is eligible for post-hospital SNF coverage. According to one such rule, known as the "three-midnight rule," a patient is eligible for SNF coverage only if he or she has been "hospitalized . . . for medically necessary inpatient hospital or inpatient [critical access hospital] care, for at least 3 consecutive calendar days, not counting the date of discharge." 42 C.F.R. § 409.30(a)(1). And according to another rule, "a patient is considered an inpatient if [he or she is] formally admitted as [an] inpatient." Ctrs. for Medicare & Medicaid Servs., Publ'n No. 100-02, *Medicare Benefit Policy Manual*, ch. 1, § 10 (45th rev. 2006) [hereinafter *Medicare Benefit Policy Manual*], *available at* http://www.cms.hhs.gov/Manuals/IOM/list.asp. Landers, Dixon, and Grigley all spent three — but only three — consecutive midnights in hospitals and then moved to nursing homes, where they received extended care services. But while in the hospital, each of them spent at least one midnight either in the emergency room or on observation status before being formally admitted.

---

[1] In 1977, HHS — then called the Department of Health, Education, and Welfare — established the Health Care Financing Administration (the "HCFA"), *see* Reorganization Order, 42 Fed. Reg. 13,262 (Mar. 9, 1977), and vested in it the Secretary's full rulemaking powers under the Medicare statutes, *see* Statement of Organization, Functions, and Delegations of Authority, 49 Fed. Reg. 35,247, 35,248 (Sept. 6, 1984). The HCFA was renamed the Centers for Medicare and Medicaid Services in 2001. *See* Centers for Medicare & Medicaid Services; Statement of Organization, Functions and Delegations of Authority; Reorganization Order, 66 Fed. Reg. 35,437 (July 5, 2001).

Accordingly, CMS determined that, because they had not spent three consecutive midnights hospitalized after having been formally admitted, Part A did not cover their SNF stays.

Landers, Dixon, and Grigley challenged CMS's interpretation of the qualifying hospital stay requirement in a putative class action. They sought a permanent injunction and a writ of mandamus prohibiting the Secretary from excluding Medicare beneficiaries' time in the emergency room and on observation status from counting toward the qualifying stay requirement. The district court granted class certification, *Landers v. Leavitt* (*Landers I*), 232 F.R.D. 42 (D. Conn. 2005), and on cross-motions for summary judgment, ruled in favor of the Secretary, *Landers v. Leavitt* (*Landers II*), No. 3:04-cv-1988 (JCH), 2006 WL 2560297 (D. Conn. Sept. 1, 2006). The plaintiffs now appeal.

## DISCUSSION

The plaintiffs challenge the district court's ruling on three grounds. First, they argue that the Medicare statute entitles them to coverage for their post-hospitalization SNF stays. Second, they contend that CMS's interpretation of the statute violates the equal protection guarantee of the U.S. Constitution. Third, they argue that the district court erred by basing its decision exclusively on the administrative record.

# I.

The Medicare statute provides coverage for a post-hospitalization SNF stay for a beneficiary who receives extended care services in an SNF after having been "an inpatient for not less than 3 consecutive days" in a hospital. 42 U.S.C. § 1395x(i). Neither the statute nor any applicable regulation defines "inpatient." CMS's policy manual defines an inpatient as a person who has been formally admitted to a hospital. The government urges us to credit the interpretation of the statute that it has set forth in the policy manual. We only consider whether we should defer to the agency's interpretation of the statute, however, upon finding the statute ambiguous. *Gen. Dynamics Land Sys. v. Cline*, 540 U.S. 581, 600 (2004) ("[D]eference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987))); *Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 55 (2d Cir. 2004) ("If the provisions of the statute are unclear or ambiguous . . . we must decide whether to defer to [the agency's] reading of them . . . . If we decide that we are to defer, we must then decide the appropriate level of deference."). We have little difficulty finding ambiguity here. The statute provides no definition of "inpatient," and both the plaintiffs and the agency can cite to dictionary definitions supporting their competing definitions. *See* Webster's Third New

International Dictionary 1167 (1976) (defining "inpatient" as "a patient in a hospital or infirmary who receives lodging and food as well as treatment"); American Heritage Dictionary of the English Language 932 (3d ed. 1992) (defining "inpatient" as "[a] patient who is admitted to a hospital or clinic for treatment that requires at least one overnight stay"); *see also* Oxford English Dictionary (2d ed. 1989) (defining "inpatient" as "a patient who remains in a hospital while under medical treatment"). Therefore, we agree with the agency that the statute is ambiguous as to whether pre-admission time spent in observation and in the emergency room should be considered "inpatient" time upon the patient's later admission.

The next question for us is whether the agency's interpretation of "inpatient" is of the type that is eligible for deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). If it is, then we proceed with a *Chevron* analysis. *McNamee v. Dep't of the Treasury*, 488 F.3d 100, 105 (2d Cir. 2007); *Levine v. Apker*, 455 F.3d 71, 80 (2d Cir. 2006). If not, then we construe the statute in the first instance, giving effect to CMS's nonlegislative interpretation to the extent we find it persuasive in accordance with *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). We review de novo these questions of law that the district court addressed on cross-motions for summary judgment. *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621-22 (2d Cir.

2008); *Prot. & Advocacy for Persons with Disabilities v. Mental Health & Addiction Servs.*, 448 F.3d 119, 123 (2d Cir. 2006); *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005).

## A.

"[A]n 'administrative implementation of a . . . statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Rotimi v. Gonzales*, 473 F.3d 55, 57 (2d Cir. 2007) (per curiam) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)). The first half of this test is clearly satisfied: Congress has delegated general rulemaking authority with respect to Medicare to the Secretary of HHS, who in turn has delegated that authority to CMS. *See, e.g.*, 42 U.S.C. § 1395ff(a)(1) ("The Secretary shall promulgate regulations and make initial determinations with respect to benefits under part A or part B of this subchapter in accordance with those regulations . . . ."); *id.* § 1395hh(a)(1) ("The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995) (recognizing "the Medicare statute's broad delegation of authority"); *New York ex rel. Stein v. Sec'y of Health & Human Servs.*, 924 F.2d

431, 433 (2d Cir. 1991) ("Resolution of Medicare reimbursement issues requires an understanding of complicated and technical facts, and Congress has delegated these difficult decisions to the agency that has specialized knowledge in the area."). Thus, we move to the second half of the test and consider whether CMS has promulgated its interpretation in the exercise of its authority.

Most agency interpretations that have qualified for *Chevron* deference are rules that have been promulgated in "regulations issued through notice and comment or adjudication, or in another format authorized by Congress for use in issuing 'legislative' rules." *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002) (citations omitted); *see also Mead*, 533 U.S. at 230 ("[T]he overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication."). The policy manual provision at issue here, of course, is not the product of notice-and-comment rulemaking or formal adjudication. Nevertheless, less formal, nonlegislative interpretations are not for that reason alone disqualified from receiving *Chevron* deference. *See Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002); *Mead*, 533 U.S. at 230-31; *Cmty. Health Ctr.*, 311 F.3d at 138; *see also Gonzales v. Oregon*, 546 U.S. 243, 258-69 (2006) (considering at great length whether an interpretive rule was eligible for *Chevron* deference but ultimately answering in the negative).

11

Although nonlegislative rules are not per se ineligible for *Chevron* deference as a general matter, we are aware of few, if any, instances in which an agency manual, in particular, has been accorded *Chevron* deference.[2] Indeed, we have remarked that *Christensen v. Harris County*, 529 U.S. 576 (2000), "made clear that 'interpretations contained in policy statements, agency manuals and enforcement guidelines . . . do not warrant *Chevron* style deference.'" *De La Mota v. U.S. Dep't of Educ.*, 412 F.3d 71, 79 (2d Cir. 2005) (quoting *Christensen*, 529 U.S. at 587). Although both *Barnhart* and *Mead* recognized that some subset of informal interpretations can receive *Chevron* deference, the sole example that both cases cite, *NationsBank v. Variable Annuity Life Insurance Co.*, 513 U.S. 251 (1995), concerned an agency opinion letter, *id.* at 255, which is qualitatively different from an agency manual. Neither *Barnhart* nor *Mead* casts doubt on prior pronouncements that agency manuals, as a class, are generally ineligible for *Chevron* deference. *See Mead*, 533 U.S. at 234 (describing

---

[2] Arguing to the contrary, the government points us to the Ninth Circuit's recent decision in *County of Los Angeles v. Leavitt*, 521 F.3d 1073 (9th Cir. 2008), which cited *Chevron* in discussing a definition set forth in CMS's Medicare Provider Reimbursement Manual. *Id.* at 1078. The Ninth Circuit has clearly stated, however, that Medicare policy manuals are interpretive rules and therefore do not receive *Chevron* deference. *See Erringer v. Thompson*, 371 F.3d 625, 629-33 (9th Cir. 2004); *Cmty. Hosp. v. Thompson*, 323 F.3d 782, 788, 791 (9th Cir. 2003); *see also Omohundro v. United States*, 300 F.3d 1065, 1068 (9th Cir. 2002) (per curiam) ("[A]n administrative agency's interpretation of a statute contained in an informal rulemaking must be accorded the level of deference set forth in *Skidmore* . . . ."). Moreover, although the court in *Los Angeles* cited *Chevron*, it appeared elsewhere in the opinion to treat the manual provision as an interpretive rule to be considered in accordance with *Skidmore*. *Los Angeles*, 521 F.3d at 1077 n.5; *id.* at 1079 n.8.

policy statements, agency manuals, and enforcement guidelines as "beyond the *Chevron* pale"); *Guernsey Mem'l Hosp.*, 514 U.S. at 99 (definition in HHS's Medicare Provider Reimbursement Manual "is a prototypical example of an interpretive rule" and therefore "do[es] not have the force and effect of law and [is] not accorded that weight in the adjudicatory process"); *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 660 (D.C. Cir. 2003) (*Mead* and *Christensen* "cited 'agency manuals' as an archetype of the kind of document that is not entitled to [*Chevron*] deference"). We therefore decline to accord *Chevron* deference to the interpretation of "inpatient" in CMS's policy manual.

## B.

An agency interpretation that does not qualify for *Chevron* deference is still entitled to "respect according to its persuasiveness," *Mead*, 533 U.S. at 221, as evidenced by "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade," *id.* at 228 (quoting *Skidmore*, 323 U.S. at 140). As we conduct this inquiry, we are mindful of the Supreme Court's repeated suggestion that HHS interpretations, in particular, should receive more respect than the mine-run of agency interpretations. *See, e.g.*, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 & n.14 (1981). Indeed, we have observed that,

13

in cases such as those involving Medicare or Medicaid, in which CMS, "a highly expert agency[,] administers a large complex regulatory scheme in cooperation with many other institutional actors, the various possible standards for deference" — namely, *Chevron* and *Skidmore* — "begin to converge." *Cmty. Health Ctr.*, 311 F.3d at 138.

**1.**

Our analysis of the *Skidmore* factors in this case leads us to conclude that CMS's interpretation is entitled to a great deal of persuasive weight. First, CMS's interpretation is longstanding. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 522 n.12 (1982) ("In construing a statute, this Court normally accords great deference to the interpretation, particularly when it is longstanding, of the agency charged with the statute's administration."). Medicare came into existence in 1965. *See* Health Insurance for the Aged Act, Pub. L. No. 89-97, tit. I, 79 Stat. 290 (1965). A nearly contemporaneous HHS regulation established a rule that, like CMS's current rule, began counting inpatient days for purposes of the qualifying stay requirement on the day the patient was formally admitted:

> *The 3 consecutive days as a hospital inpatient; defined.*
> The 3-consecutive-day hospital inpatient requirement is a period of 3 consecutive calendar days beginning with the calendar day of admission even if less than a 24-hour day, and ending with the day before the calendar day of discharge. Thus, in determining whether the 3-consecutive-day requirement is met, the day of admission is counted as one day; the day of

14

> discharge is not counted as a day; and each intervening day is counted as a single day.

20 C.F.R. § 405.120(c) (1966).[3] CMS's interpretation thus reflects a position that HHS first adopted more than 40 years ago.

Second, CMS is consistent in its interpretation, employing the same definition elsewhere in its guidance manual and expressly declining to count time on observation status or in the emergency room toward the qualifying stay requirement. *See Medicare Benefit Policy Manual*, *supra*, ch. 8, § 20.1. This section of the policy manual also references the 1966 Federal Register publication in which HHS promulgated § 405.120(c), which further bolsters the conclusion that CMS desires to maintain its consistent and long-held position.

The plaintiffs urge us to find the government's position inconsistent based on the way in which CMS reimburses beneficiaries for their hospital stays. The plaintiffs in this case sought Medicare reimbursement not only for their post-hospitalization SNF stays, but also for the time they spent in hospitals before their SNF stays. The same section of the Medicare statute that provides coverage for post-hospitalization SNF stays also provides coverage for hospital

---

[3] This regulation, although codified, was not subject to the Administrative Procedure Act's notice-and-comment process because Medicare regulations were not subject to 5 U.S.C. § 553(b)'s requirements until 1971. *Nat'l Med. Enters., Inc. v. Sullivan*, 957 F.2d 664, 670 n.8 (9th Cir. 1992); *see also* Public Participation in Rule Making, 36 Fed. Reg. 2532 (Feb. 5, 1971) (statement of the Secretary of Health, Education, and Welfare opting into the procedures specified by § 553). Even though not adopted pursuant to relatively formal procedures, however, the regulation still evidences the longstanding nature of the agency's view.

stays, in the latter case for "inpatient hospital services . . . for up to 150 days during any spell of illness."  42 U.S.C. § 1395d(a)(1).  Yet the plaintiffs were reimbursed *both* for the services they received after they were formally admitted — in the government's view, the only time during which they were inpatients — *and* for the services they received while in the emergency room and on observation status before being formally admitted.  This reimbursement policy, the plaintiffs contend, makes the government's position with respect to SNF reimbursement unreasonable and inconsistent: if pre-admission emergency room and observation status services are "inpatient hospital services," why should time spent in the emergency room or on observation status not count as "inpatient" hospital time for the purpose of meeting the qualifying stay requirement?

The difficulty with this argument is that the statute mandates — or at least strongly counsels in favor of making — precisely the distinction that the government has drawn. Part A's reimbursements for inpatient hospital services are determined by reference to the statutory term "operating costs of inpatient hospital services."  As the statute defines that term, it means operating costs "with respect to inpatient hospital services . . . , *and includes the costs of all services* for which payment may be made under this subchapter that are provided by the hospital . . . *to the patient during the 3 days . . . immediately*

16

*preceding the date of the patient's admission* if such services are . . . related to the admission." 42 U.S.C. § 1395ww(a)(4) (emphases added). Thus, § 1395ww(a)(4) directs CMS to provide coverage for an inpatient hospital stay and up to three days of related in-hospital services rendered before the patient was admitted to the hospital. The statute does not, however, require or even suggest that the pre-admission days themselves be treated as inpatient days. Indeed, CMS has relied on this aspect of the statute to explain its present position. *See* Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2006, 70 Fed. Reg. 29,070, 29,100 (May 19, 2005) [hereinafter 2005 Proposed Rules]. Accordingly, regardless of whether we think it sensible as a policy matter for CMS to reimburse pre-admission hospital services as if they were inpatient services but not consider that time to be part of a pre-SNF inpatient stay, the *statutory* requirement that pre-admission services be reimbursed leads us to find no *regulatory* inconsistency in CMS's decision not to count pre-admission hospital time in determining whether a patient has had an SNF qualifying stay.

Third, CMS has recently reconsidered its position on the public record. In 2005, CMS "invite[d] comments on whether [it] should consider the possibility of counting the time spent in observation status toward meeting the SNF benefit's qualifying 3-day hospital stay requirement." *Id.* at 29,099. In inviting

17

these comments, CMS observed that the three-day stay requirement was designed "to target the SNF benefit more effectively at the limited segment of the nursing home population that the benefit was actually designed to cover (that is, those beneficiaries requiring a short-term, fairly intensive stay in a SNF as a continuation of an acute hospital stay of several days)." *Id.* It observed, further, that the medical practice of placing patients on observation status before formally admitting them has grown in prevalence since Congress enacted the Medicare statute in 1965, that some commentators have suggested that patients on observation status receive qualitatively the same type of care as admitted patients, and that some view it as unfair for Medicare reimbursement decisions to turn on a distinction that they believe to be "a mere recordkeeping convention on the part of the hospital rather than a substantive change in the actual care that the beneficiary receives there." *Id.*

Following this invitation, CMS received comments on this precise issue. Many of these comments "expressed support for the idea that hospital time spent in observation status immediately preceding a formal inpatient admission should count toward satisfying the SNF benefit's statutory qualifying three-day hospital stay requirement." Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2006, 70 Fed. Reg. 45,026, 45,050 (Aug. 4, 2005). "[S]ome others supported counting the obser-

18

vation time," but not "time spent in the emergency room." *Id.*

Ultimately, however, CMS declined to change its interpretation. With regard to the suggestion that emergency room time count toward the qualifying stay requirement, CMS "d[id] not share the belief . . . that time spent in the emergency room is essentially comparable to observation time in this context" because "the mere presence of time spent in the emergency room prior to formal admission would not, in itself, serve to identify the degree of severity of a particular patient's condition during that time." *Id.* With regard to the suggestion that time on observation status count toward the requirement, CMS stated that it was "continuing to review this issue, but [was] not yet ready to make a final determination." *Id.* CMS was wary of changing its interpretation, it said, because it did not want to adopt a reimbursement guideline that conflicted with what it viewed as Congress's "intent in establishing the qualifying hospital stay requirement" — namely, that the SNF benefit "serv[e] as a less expensive alternative to what would otherwise be the final, convalescent portion of an acute care stay of several days as an inpatient at a hospital." *Id.* at 45,051.

The preceding exchange shows that CMS opened its policies to public comment, received comments challenging the interpretation at issue in this case, and declined to change its position in light of what it perceives as Congress's

intent in imposing the qualifying stay requirement. CMS's statement with respect to observation status may be less than wholly satisfying, but it is not so deficient that it lacks persuasive force. To be sure, we may reject an agency interpretation that merely "mirrors the common understanding" at the time the agency adopted its interpretation but has not been revised to reflect "changing circumstances, particularly in areas characterized by rapid technological development." *Detsel v. Sullivan*, 895 F.2d 58, 63-64 (2d Cir. 1990). Here, however, CMS does not attempt to justify its position by arguing that it was reasonable when first adopted. Rather, CMS appears to be acutely aware of the changes in medical practice since the 1960s and has declined to include time on observation status toward the three-day count because, in its view, doing so would risk undermining congressional intent. We are thus unable to conclude that CMS "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence" before it. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The plaintiffs urge us to view this public comment opportunity and CMS's reconsideration of its interpretation as a farce or as otherwise tainted because it was conducted during the pendency of this litigation. We decline to do so. Although we do not defer to agency constructions of statutes asserted as

litigating positions, *see Rhodes-Bradford v. Keisler*, 507 F.3d 77, 80 (2d Cir. 2007) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988)), CMS presented its construction to the public at large and considered its position as a generally applicable matter rather than for a single litigation. The law generally seeks to encourage public participation in agency decisionmaking, *see Am. Postal Workers Union v. U.S. Postal Serv.*, 707 F.2d 548, 565 (D.C. Cir. 1983); *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978), and we would frustrate rather than further that goal if we were to strip an agency of deference it would otherwise be due merely because that public participation was spurred by litigation rather than arising from the agency's self-generated desire or beneficence. By way of analogy, a duly promulgated agency regulation enjoys the full extent of *Chevron* deference even when the regulation was prompted by pending litigation that lurked in the background. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740-41 (1996). The plaintiffs proffer no persuasive reason why we should question the integrity of CMS's deliberative process here given that we would decline to do so in the *Chevron* context.

Fourth, CMS's rule is the product of an interpretation that is relatively formal within the universe of informal interpretations. "[T]he deference due" to an agency interpretation "is at the high end of the spectrum of deference" when

21

"the interpretation in question is not merely ad hoc but . . . is applicable to all cases." *Chauffer's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 129 (2d Cir. 2007). CMS's interpretation, set forth in a policy manual rather than, for example, a nonprecedential letter ruling, is generally applicable and is not an ad hoc position. In the Medicaid context, we have regarded a CMS manual as meriting an "intermediate level" of deference that lies "between a published recommendation and an interpretation advanced only in litigation," *Rabin v. Wilson-Coker*, 362 F.3d 190, 198 (2d Cir. 2004), and we do the same here.

\*              \*              \*

In sum, the *Skidmore* factors lead us to regard the statutory interpretation set forth in CMS's policy manual as persuasive.

**2.**

In view of our *Skidmore* analysis, we conclude that a Medicare beneficiary is not an inpatient within the meaning of § 1395x(i) unless he or she has been formally admitted to a hospital. We reach this conclusion not only because our decision is informed by CMS's highly persuasive interpretation, but also because it accords with the statutory text and our governing precedents.

The statutory definition of inpatient hospital services enumerates such services as "bed and board," 42 U.S.C. § 1395x(b)(1), "nursing services," *id.* § 1395x(b)(2), and "other diagnostic or therapeutic items or services," *id.*

22

§ 1395x(b)(3). The plaintiffs urge us to credit their argument that anyone who receives these services in the hospital is receiving inpatient hospital services and is therefore an inpatient. In light of the statutory text, however, this argument is ultimately question-begging. The statute defines inpatient hospital services to include the aforementioned items and services when they are "furnished *to an inpatient of a hospital* and . . . by the hospital." *Id.* § 1395x(b) (emphasis added). Thus, services cannot be inpatient hospital services unless they are furnished to an inpatient. The construction of the statute that the plaintiffs propose would read the words "to an inpatient of a hospital" out of the statutory text. The facts of this case demonstrate, at most, that the services rendered to the plaintiffs *would* have been inpatient hospital services *if* the plaintiffs had been inpatients. Unfortunately, that is not enough to entitle the plaintiffs to reimbursement because it still leaves unanswered the essential issue of defining an inpatient.

The conclusion here — that one is an inpatient for the purpose of § 1395x(i) only if one has been formally admitted to a hospital — is also not in tension with our decision in *Levi v. Heckler*, 736 F.2d 848 (2d Cir. 1984) (per curiam), or those of the other Courts of Appeals that have adopted the same reasoning, *see Mayburg v. Sec'y of Health & Human Servs.*, 740 F.2d 100 (1st Cir. 1984) (Breyer, J.); *Kaufman v. Harris*, 731 F.2d 370 (6th Cir. 1984) (per curiam); *Friedberg v. Schweiker*, 721 F.2d 445 (3d Cir. 1983) (per curiam). These

23

cases concerned Medicare's coverage of inpatient hospital services, for which Medicare participants are entitled to reimbursement "for up to 150 days during any spell of illness." 42 U.S.C. § 1395d(a)(1). Under the statute, a spell of illness begins on the first day a patient is furnished inpatient hospital services and ends when he or she is neither an inpatient of a hospital nor an inpatient of an SNF. *Id*. § 1395x(a). In *Levi*, we defined an inpatient of an SNF to mean a patient "who both resides in a skilled nursing facility *and* receives the 'skilled nursing care' there available," 736 F.2d at 849 (quoting *Levi v. Heckler*, 575 F. Supp. 1381, 1384 (S.D.N.Y. 1983)) (internal quotation mark omitted), and thus held that a patient's spell of illness ended if he resided in an SNF but received only custodial care, not nursing care. But in *Levi*, we considered only whether formal residence in an SNF was *sufficient* to render one an inpatient of that facility. We had no occasion to address the analogue of the question that is presented here: whether formal admission or formal residence is *necessary* to render one an inpatient. *Levi* therefore does not shed light on the question at issue.

Accordingly, we conclude this portion of our opinion by reiterating our core holding in this case: in determining whether a Medicare beneficiary has met the statutory three-day hospital stay requirement needed to qualify for post-hospitalization SNF benefits under Part A, the time that the patient spends in the emergency room or on observation status before being formally admitted to

24

the hospital does not count. In so holding, we expressly reject the rule of *Jenkel v. Shalala*, 845 F. Supp. 69 (D. Conn. 1994), which held that "later 'formal admission'"of a patient following her treatment in the emergency room operates as "a nunc pro tunc ratification of her de facto admission at the time of her arrival in the emergency room." *Id.* at 71 (emphasis omitted). As a postscript to this portion of our holding, we note that the Medicare statute does not unambiguously require the construction we have adopted. If CMS were to promulgate a different definition of inpatient in the exercise of its authority to make rules carrying the force of law, that definition would be eligible for *Chevron* deference notwithstanding our holding today. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-86 (2005).

## II.

The plaintiffs also challenge the constitutionality of CMS's rule, arguing that it violates their rights to equal protection under the Fifth Amendment. *See Nicholas v. Tucker*, 114 F.3d 17, 19 (2d Cir. 1997) ("Although . . . the Fifth [Amendment] does not contain an equal protection clause, 'it does forbid discrimination that is "so unjustifiable as to be violative of due process."' The standards for analyzing equal protection claims under either [the Fifth or the Fourteenth A]mendment are identical." (citation omitted) (quoting *Schneider v. Rusk*, 377 U.S. 163, 168 (1964))). Specifically, they contend that the rule

25

unlawfully discriminates against Medicare patients who spend time in the emergency room or on observation status by treating them less favorably than those who are formally admitted immediately upon arriving or very soon thereafter.

The plaintiffs concede that CMS's interpretation does not implicate any suspect classifications and that, therefore, we should apply rational basis scrutiny. *See Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998). Accordingly, we should find the interpretation constitutionally valid if it is "rationally related to a legitimate government interest," *Kraham v. Lippman*, 478 F.3d 502, 506 (2d Cir. 2007), and strike it down as unconstitutional only if the plaintiffs "demonstrate that the government regulation is arbitrary and/or unreasonable, and not rationally related to a legitimate government interest," *Tanov v. INS*, 443 F.3d 195, 201 (2d Cir. 2006).

We conclude that the rule does not violate the Constitution's guarantee of equal protection. As CMS has noted, Congress intended to create an extended care benefit to serve "as a less expensive alternative to . . . the final, convalescent portion of an acute care stay . . . at a hospital." Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2006, 70 Fed. Reg. 29,070, 29,099 (May 19, 2005). CMS rationally could have concluded that a bright line rule measuring inpatient time

26

based on formal admission would simplify claims processing and reduce administration costs, while targeting the program at the group Congress intended to benefit. CMS's legitimate interest in administrative efficiency is sufficient to uphold this rule against a rational basis challenge. *See Ellis v. Apfel*, 147 F.3d 139, 146 (2d Cir. 1998).

## III.

Plaintiff's final argument is that the district court erred when it refused to consider evidence outside the administrative record. Judicial review of administrative determinations with respect to Medicare benefits is governed by 42 U.S.C. § 1395ff(b)(1)(A), which incorporates the provisions of 42 U.S.C. § 405(g). According to the latter statute, the district court ordinarily must base its judgment "upon the pleadings and transcript of the record." 42 U.S.C. § 405(g); *see also Mathews v. Weber*, 423 U.S. 261, 263 (1976) (noting that, under § 405(g), "[t]he court may consider only the pleadings and administrative record, and must accept the Secretary's findings of fact so long as they are supported by substantial evidence"); *id.* at 270 ("[Under § 405(g),] neither party may put any additional evidence before the district court."). Nevertheless, the district court has "adequate authority to resolve any statutory or constitutional contention that the agency [did] not, or cannot, decide," a power that includes, "where necessary, the authority to develop an evidentiary record." *Shalala v. Ill. Council*

*on Long Term Care, Inc.*, 529 U.S. 1, 23-24 (2000).

In support of their motion for summary judgment, the plaintiffs submitted a statement of material facts, several declarations, and interrogatories in which CMS officials explained the policy at issue. The district court granted the government's motion to strike these extra-record submissions, ruling that because the case presents "a purely legal challenge to the Secretary's policy," it "does not require factual determinations with respect to individual plaintiffs that would require resort to evidence outside the administrative record." *Landers II*, 2006 WL 2560297, at *3. Because the district court's decision not to admit evidence outside the record is an exercise of its "authority to develop an evidentiary record," *Ill. Council on Long Term Care*, 529 U.S. at 23-24, we review that decision for abuse of discretion. *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) ("We review evidentiary rulings for abuse of discretion." (citing *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000))).

The district court correctly excluded the interrogatories. In the ordinary case, we must uphold or set aside the agency's action on the grounds that the agency has articulated. *State Farm*, 463 U.S. at 50. Supplementation of the administrative record may be appropriate if "there was such failure to explain administrative action as to frustrate effective judicial review," *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (per curiam), but we find no such failure here. As

28

discussed above, we find the agency's justification of its decision not to change its interpretation "disclose[s] the factors that were considered," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971), and adequately explains its action. *See Camp*, 411 U.S. at 142. The plaintiffs argue that this principle of judicial review creates a risk that agencies will be able to hoodwink courts into accepting agencies' self-interested justifications, but we are unwilling to ascribe such nefarious motives to agency action as a general matter. *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies . . . ."); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (referring to the "presumption of honesty and integrity in those serving as [agency] adjudicators"). It is well-established that courts should focus exclusively on the formal administrative record unless that record is insufficient to shed light on the rationale for the agency's decision. The record here is sufficient and we decline to consider additional evidence.

The district court also correctly excluded the plaintiffs' declarations and statement of material facts. The facts set forth in these submissions are not material to the plaintiffs' eligibility for reimbursement because the nature of the medical services rendered to the plaintiffs cannot, by themselves, establish the plaintiffs' eligibility for SNF coverage. *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) ("The concept of materiality requires . . . a reasonable possibility that

29

the new evidence would have influenced the Secretary to decide [the] claimant's application differently."). In refusing to consider these submissions, therefore, the district court acted within its sound discretion.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.