**WILLOWOOD OF GREAT BARRINGTON, INC., d/b/a fairview commons, et al., Plaintiff**

v.

**Kathleen SEBELIUS, Secretary, U.S. Department of Health and Human Services,[1] Defendant.**

**C.A. No. 08–CV–30076–MAP.**

United States District Court, D. Massachusetts.

July 28, 2009.

1. Pursuant to Fed.R.Civ.P. 25(d), Kathleen Sebelius has been substituted for the originally-named Defendant, Michael O. Leavitt.

Kenneth A. Behar, Gary A. Rosenberg, Rochelle H. Zapol, Behar & Kalman, Boston, MA, for Plaintiffs.

Scott Risner, U.S. Department of Justice, Washington, DC, for Defendant.

*MEMORANDUM AND ORDER RE: REPORT AND RECOMMENDATION WITH REGARD TO CROSS MOTIONS FOR SUMMARY JUDGMENT*

(Dkt. Nos. 13, 23 & 30)

PONSOR, District Judge.

This is an action for review of a decision by the Medicare Appeals Council, which upheld decisions by an administrative law judge denying payment for certain tests conducted by Plaintiff during the month of October 2005. The parties filed cross motions for summary judgment that were referred to Magistrate Judge Kenneth P. Neiman for report and recommendation.

On June 30, 2009, Judge Neiman issued his Report and Recommendation, to the effect that Plaintiff's motion should be denied and Defendant's motion should be allowed. The conclusion of the Report and Recommendation admonished the parties at n. 7 that objections to the Report and Recommendation must be filed within ten days of receipt. No objection has been filed by either party.

The Magistrate Judge's lengthy and detailed memorandum makes discussion of the substance of the motions unnecessary. Suffice to say that Judge Neiman's analysis is well supported by the facts and law, and further, that the failure of either party to file an objection precludes further review.

For the foregoing reasons, upon *de novo* review, the court hereby ADOPTS the Report and Recommendation (Dkt. No. 30). Based upon this, the court hereby DENIES Plaintiff's motion (Dkt. No. 13) and ALLOWS Defendant's motion (Dkt. No. 23). The clerk is ordered to enter a judgment for Defendant. This case may now be closed.

It is So Ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO CROSS MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 13 and 23)*

NEIMAN, United States Magistrate Judge.

This case, brought against the Secretary of the United States Department of Health and Human Services (hereinafter "Defendant"), concerns the potential reimbursement under Part B of the federal Medicare program for one month of blood glucose laboratory tests performed on twelve patients by three skilled nursing facilities (hereinafter "Plaintiffs"). Plaintiffs' complaint seeks judicial review of a February 19, 2008 decision by the Medicare Appeals

Council ("MAC")—which upheld August 9, 2007 decisions by an administrative law judge—denying payment for such tests during the month of October, 2005. The purported reason for the denials was that the patients' attending physicians were not promptly notified of the results of each test before the physicians ordered subsequent tests. Plaintiffs assert that prompt physician notification of the blood glucose tests in October of 2005 was not required by federal law and, hence, that both the administrative law judge and the MAC erred in determining otherwise; Defendant argues that such physician notification *was* required.

The parties have filed cross-motions for summary judgment which, in turn, have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the court will recommend that Plaintiffs' motion for summary judgment be denied and that Defendant's cross-motion be allowed.

## I. STANDARDS OF REVIEW

"Summary judgment is warranted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 41 (1st Cir.2005) (quoting Fed. R. Civ. Pro. 56(c)). Generally speaking, cross-motions for summary judgment do not alter the basic summary judgment standard, but require the court to determine whether either party deserves judgment as a matter of law on facts that are not disputed. *Adria Int'l Group, Inc. v.*

*Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir.2001).

■■■ The instant case, however, is before the court under the jurisdictional provision of 42 U.S.C. § 1395ff(b)(1)(A), which incorporates 42 U.S.C. § 405(g) and allows for judicial review, pursuant to the Administrative Procedures Act ("APA"), of a final decision of Defendant with respect to benefits under Medicare Part B.[2] "Because the APA standard affords great deference to agency decisionmaking and because [Defendant]'s action is presumed valid, judicial review, even at the summary judgment stage, is narrow." *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997) (citing, *inter alia*, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). At bottom, "[Defendant]'s decision may be overturned only if 'it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law.'" *Currier v. Thompson*, 369 F.Supp.2d 65, 68 (D.Me. 2005) (quoting *Chipman v. Shalala*, 90 F.3d 421, 422 (10th Cir.1996)).

## II. BACKGROUND

Because this case arises under section 1395ff(b)(1)(A), the court's factual review is limited to the administrative record. *See Landers v. Leavitt*, 2006 WL 2560297, at *3 (D.Conn. Sept. 1, 2006) (citing *Mathews v. Weber*, 423 U.S. 261, 263, 270, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976) (holding that under 42 U.S.C. § 405(g), the "court may consider only the pleadings and administrative record" and "neither party may put any additional evidence before the district court")), *aff'd*, 545 F.3d 98 (2d Cir.2008).

**2.** Although Plaintiffs have also attempted to invoke jurisdiction under 28 U.S.C. § 1331, the Supreme Court has clearly stated that "the sole avenue for judicial review for all claims arising under the Medicare Act" is 42

U.S.C. § 405(g), "to the exclusion of 28 U.S.C. § 1331." *Heckler v. Ringer*, 466 U.S. 602, 615, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (citations and internal quotation marks omitted).

Accordingly, the following undisputed facts from the administrative record are taken from the Statement of Material Facts of Record as to Which Plaintiffs Contend There is no Genuine Issue to be Tried (Document No. 15, hereinafter "Pls.' Facts") and Defendant's Statement of Material Facts not in Dispute (Document No. 25, hereinafter "Def.'s Facts"). Several additional undisputed facts, also taken from the administrative record, are addressed in the discussion section below.

Diabetes mellitus is a chronic metabolic disease in which the body does not produce or properly store insulin, the hormone needed to convert sugar, starches and other foods into energy to sustain daily life. (Pls.' Facts ¶ 8.) An unstable diabetic (more commonly referred to as a "brittle diabetic") is one whose blood glucose level often swings from too high (hyperglycemia) to too low (hypoglycemia) and vice versa. (*Id.*) As a result, blood glucose testing is important for brittle diabetics such as the twelve patients involved in this case. (See *id.* ¶¶ 10–11.)

Plaintiffs, three skilled nursing facilities, are non-profit affiliates of Berkshire Health Systems. (*Id.* ¶ 6.) During October of 2005, each attending physician for the twelve patients issued a patient-specific order authorizing at least twice-daily blood glucose testing. (*Id.* ¶¶ 14, 17; Def.'s Facts ¶ 1.) These orders—called "sliding scale" orders—consisted of the physician directing Plaintiffs' nurses to do three things: (1) take a test-reading of the patient's blood glucose via the finger-stick method (using a hand-held device designed for home use), (2) administer a specific dose of insulin on-the-spot, and (3) report to the physician any "aberrant" result, *i.e.*, one that was below or above the scale set forth in the order. (See Pls.' Facts ¶¶ 19, 22; Def.'s Facts ¶¶ 2–3.)

It is undisputed that no physician performed any part of the testing or was present for any single test. (Def.'s ¶ 2.) The parties also agree that non-aberrant results—*i.e.*, those falling within acceptable ranges—were simply recorded on the patients' charts without the physicians being notified, promptly or otherwise. (*Id.* ¶ 3.) To be sure, the results were available for the physicians to review at their next routine visits. (*Id.*) There is no indication, however, that any of the results were regularly reviewed by the physicians. (*Id.*)

In late 2005 and into 2006, a Medicare fiscal intermediary, Mutual of Omaha, denied Plaintiffs' claims for reimbursement for the October 2005 blood glucose tests administered under the physicians' sliding-scale orders. (Pls.' Facts ¶ 1.) The denials were then upheld by Maximus Federal Services ("Maximus"), a Medicare contractor. (*Id.* ¶¶ 1–2.) Plaintiffs timely appealed Maximus's determinations to an administrative law judge (hereinafter "the ALJ") for a January 17, 2007 evidentiary hearing. (*Id.* ¶¶ 1, 3.)

Pursuant to an agreement by the parties, the evidentiary hearing dealt with only five of the twelve beneficiaries, three selected by Plaintiffs and two selected by the ALJ. (*Id.* ¶¶ 2–3.) The parties further agreed that the hearing results in the five cases would apply to all twelve patients. (*Id.* ¶ 2.) At the hearing, Plaintiffs presented three witnesses: an attending physician for one of the five beneficiaries, a second physician expert witness, and a Medicare billing expert. (*Id.* ¶ 3.) In addition, Plaintiffs filed exhibits and the ALJ compiled an administrative record which consisted of documents submitted by Mutual of Omaha. (*Id.*)

By decisions dated August 9, 2007, described more fully below, the ALJ denied Plaintiffs' reimbursement claims. (*Id.* ¶ 4.) The ALJ concluded as follows:

In sum, the Beneficiary's test results were not promptly reported to the phy-

sician. Therefore, pursuant to Medicare policy, the test results were not used by the ordering physician in such a way as to qualify for reimbursement.... Based on the foregoing considerations, the undersigned ALJ finds that the Beneficiary's blood glucose testing, furnished from October 1, 2005 and October 31, 2005, was not reasonable and necessary....

(Document No. 6, the Administrative Record (hereinafter "A.R."), Vol. I at 40–41.)[3] Plaintiffs appealed the denials to the MAC which, on February 19, 2008, upheld the ALJ's decisions. (Pls.' Facts ¶ 4.) Plaintiffs filed the instant action on April 9, 2008. (*Id.* ¶ 5.)

### III. *Discussion*

The court begins its discussion by describing the legal background—a prodigious task given how the intricacies of the Medicare program weave into the detailed claims at issue—and then turns to an analysis of the parties' arguments. In the end, the court will conclude that Plaintiffs' motion for summary judgment should be denied and that Defendant's cross-motion should be allowed.

### A. *Legal And Administrative Background*

Following Defendant's lead, the legal and administrative background is divided into four sections: (1) the Medicare claims process; (2) the "reasonable and necessary" standard; (3) blood glucose tests and medical necessity standards; and (4) Plaintiffs' claims for reimbursement. These sections set up the court's analysis.

#### 1. *The Medicare Claims Process*

Title XVIII of the Social Security Act, commonly known as the Medicare Act, 42 U.S.C. § 1395 *et seq.*, establishes a pro-

gram of health insurance for the elderly and disabled. Medicare Part A pays for inpatient hospital services and other limited institutional care. 42 U.S.C. § 1395c. Medicare Part B is a voluntary supplemental program, 42 U.S.C. § 1395j, that covers medical and other health-care services, 42 U.S.C. § 1395k(a)(1), including "diagnostic laboratory tests," 42 U.S.C. § 1395x(s)(3). For the first 100 days after a qualifying hospital stay, Part A covers the costs of care in a skilled nursing facility ("SNF"). 42 U.S.C. §§ 1395d(a), 1395x(h); 42 C.F.R. § 409.61(b). SNF stays that do not qualify for Part A coverage (for example, because the 100 days of coverage have expired or because the SNF resident was not admitted from a hospital in the first place) may still encompass some services that are subject to coverage under Part B. In this setting, the SNF generally submits the Part B claim on behalf of the beneficiary, and the SNF is then authorized to receive any payment made on the claim. 42 C.F.R. § 424.51(a); Medicare Claims Processing Manual, ch. 7, § 10.A (Def's. Ex. 2).

The Medicare Program is administered by the Centers for Medicare & Medicaid Services ("CMS"), part of the United States Department of Health & Human Services ("HHS"), through private contractors. 42 U.S.C. §§ 1395h, 1395u. The contractors (usually insurance companies) are responsible for making an initial determination on claims under Part A or Part B on the basis of regulations and other policies articulated by the Secretary. 42 U.S.C. § 1395ff(a)(1). Contractors responsible for making coverage determinations regarding SNF services are referred to as "fiscal intermediaries." When a claim is filed, a fiscal intermediary—in this case, Mutual of Omaha—makes an initial deter-

---

**3.** Following the parties' lead, the court's references to the Administrative Record are to

Plaintiffs' claim concerning only one patient, "Adeline A."

mination whether to pay the claim on the basis of the information provided by the SNF. 42 U.S.C. § 1395ff(a)(1); 42 C.F.R. § 405.904(a)(2). A party dissatisfied with the initial determination is entitled to request a redetermination by the intermediary, *see* 42 U.S.C. § 1395ff(a)(3) *and* 42 C.F.R. § 405.940, and then a redetermination by a "qualified independent contractor"—in this case, Maximus—*see* 42 U.S.C. § 1395ff(c)(3)(B)(i) *and* 42 C.F.R. § 405.968.

If the claimant remains dissatisfied with the decision and the amount in controversy exceeds a certain threshold amount, the claimant may request a hearing before an ALJ. 42 U.S.C. § 1395ff(d)(1)(A); 42 C.F.R. §§ 405.1000, 405.1002. At the hearing, the claimant has an opportunity to submit new evidence, and, if the contractor elects to participate in the hearing, the claimant may take discovery. 42 C.F.R. §§ 405.1018, 405.1036, 405.1037(a). If the claimant still remains dissatisfied, he may appeal the ALJ decision to the MAC. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. §§ 405.902, 405.1100. The end result of this process is a "final decision" by Defendant that is subject to review in federal court, 42 U.S.C. § 1395ff(b)(1)(A), 42 C.F.R. §§ 405.1130, 405.1136, if the amount in controversy is $1,000, indexed for inflation. 42 U.S.C. § 1395ff(b)(1)(E)(i); 42 C.F.R. § 405.1006. Claims may be aggregated to meet this amount. 42 U.S.C. § 1395ff(b)(1)(E)(ii); 42 C.F.R. § 405.1006(e).

2. *The "Reasonable and Necessary" Standard*

When Defendant or her agent evaluates a claim for payment, she must determine whether the services satisfy the fundamental requirement of 42 U.S.C. § 1395y(a), which requires that the services be "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). This statutory standard gives Defendant wide discretion to determine whether the numerous medical services and items covered by Medicare are "reasonable and necessary" in particular circumstances. *See Goodman v. Sullivan,* 891 F.2d 449, 450 (2d Cir.1989). To accomplish the task of administering the reasonable and necessary standard, Defendant acts through both formal regulations and informal program manuals. In choosing amongst these options, Defendant is not required to promulgate regulations or policies that, "either by default rule or by specification, address every conceivable question" that may arise. *Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 96, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). Rather, she may issue regulations or informal guidance at any level of particularity she chooses and let "specific applications of a rule evolve" further through the adjudicatory administrative process. *Id.*

At the highest level of generality, Defendant may articulate "reasonable and necessary" standards through formal regulations, 42 U.S.C. § 1395hh, that have the force and effect of law throughout the administrative process, 42 U.S.C. § 1395ff(a)(1). At a more particularized level, she may publish a formal administrative ruling in the Federal Register setting forth how Medicare statutes and regulations are to be applied in particular circumstances. 42 C.F.R. § 401.108. Such regulations and administrative rulings are binding at all stages of the administrative process. 42 C.F.R. §§ 401.108(c), 405.1063.

A third way Defendant may articulate reasonable-and-necessary standards is through a "National Coverage Determination" ("NCD") "with respect to whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395ff(f)(1)(B). *See also* 42 C.F.R. §§ 400.202, 405.1060. Such NCDs "generally outline the condi-

tions for which a service is considered to be covered (or not covered)" and "are usually issued as a program instruction." (Def.'s Ex. 3 (Medicare Program Integrity Manual, ch. 13, § 13.1.1).) Like regulations and administrative rulings, NCDs are legally binding throughout the administrative appeals process. *See* 42 C.F.R. § 405.1060(a)(4).

Finally, Defendant may "further define when and under what circumstances services may be covered (or not covered)" under the reasonable-and-necessary standard through "coverage provisions" in "interpretive manuals." (Def.'s Ex. 3 (Medicare Program Integrity Manual, ch. 13, § 13.1.2).) Manual instructions are often issued in the form of program memoranda, such as "Transmittal AB–00–108" which is discussed more fully below.

"In the absence of a specific national coverage decision" or other binding policy, most Medicare coverage decisions "are made at the discretion of the local contractors," 66 Fed.Reg. 58,788, 58,788 (Nov. 23, 2001), using their best medical judgment. However, local contractors may also issue a "Local Coverage Determination" ("LCD") with respect to "whether or not a particular item or service is covered on an intermediary- or carrier-wide basis." 42 U.S.C. § 1395ff(f)(2)(B). *See also* 42 C.F.R. § 400.202. These local coverage determinations are "administrative and educational tools" that are published by contractors "to provide guidance to the public and the medical community within their jurisdictions" as to the "clinical circumstances" under which "a service is considered to be reasonable and necessary," (Def.'s Ex. 3 (Medicare Program Integrity Manual, ch. 13, § 13.1.3)), but LCDs are not binding during the administrative process or before this court, 42 C.F.R. § 405.1062(a).

### 3. *Blood Glucose Tests and Medical Necessity Standards*

According to Defendant, the manner in which claims for payment of tests for blood glucose levels are evaluated under the reasonable-and-necessary standard for purposes of Part B payment has historically been guided by a combination of formal regulations, general program instructions, and even more general statements in NCDs. A brief review of the development of Defendant's policy on blood glucose testing follows.

Blood glucose tests measure "blood sugar levels for the purpose of managing insulin therapy (shots, medication, and diet)" and "in order to maintain tight control of glucose to prevent heart disease, blindness, and other complications of diabetes." (A.R. at 264 (Transmittal AB–00–108 at 1).). Tests "often involve[ ] the use of an inexpensive hand-held device to evaluate a small sample of the patient's blood acquired through a finger stick." (*Id.*) "The convenience of the meter or stick color method allows a patient to have access to blood glucose values in less than a minute or so and has become a standard of care for control of blood glucose." 66 Fed.Reg. at 58,846.

As discussed above, Medicare Part B pays for "medical and other health services," 42 U.S.C. § 1395k(a)(1), including "diagnostic laboratory tests," 42 U.S.C. § 1395x(s)(3), but only if the services are "reasonable and necessary for the diagnosis or treatment of illness," 42 U.S.C. § 1395y(a)(1)(A). For purposes here, the central regulation promulgated pursuant to that statute—hereinafter "section 410.32(a)"—provides that "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a

specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary," section 410.32(a) continues, "are not reasonable and necessary." *Id.*

Section 410.32(a) is discussed more fully below. For now, however, it is necessary to briefly describe the following: (a) the proposed National Coverage Determination ("NCD") in 1997; (b) the proposed NCD for blood glucose tests; (c) Defendant's program guidance on blood glucose tests and medical necessity; (d) Mutual of Omaha's 2001 Local Coverage Determination ("LCD"); (e) the final NCD in 2002 and retirement of the LCD; and (f) the new blood glucose regulation effective January 1, 2007.

### a.  *The Proposed NCD in 1997*

In 1997, Congress instructed Defendant to use a negotiated rulemaking process to establish "national coverage and administrative policies for clinical diagnostic laboratory tests under part B." Balanced Budget Act of 1997, Pub.L. No. 105–33, § 4554(b), 111 Stat. 251, 461 (1997); 42 U.S.C. § 1395u note.[4] The purpose of the negotiated rulemaking was "to promote program integrity and national uniformity and simplify administrative requirements with respect to clinical diagnostic laboratory tests payable" under Part B in connection with, among other things, "medical conditions for which a laboratory test is reasonable and necessary," the "medical documentation that is required by a medicare contractor at the time a claim is submitted for a laboratory test," "[r]ecord-keeping requirements" and "information required to be submitted with a claim, including physicians' obligations regarding such requirements," and, where feasible,

"[l]imitations on frequency of coverage for the same tests performed on the same individual." *Id.* § 4554(b)(2).

Congress expressly recognized, however, that there may be limits on the extent to which NCDs could be issued for the myriad laboratory tests that may be furnished to Medicare beneficiaries. It therefore provided that, after implementation of the NCDs, Defendant "shall permit any carrier to develop and implement interim policies" "in cases in which a uniform national policy has not been established under this subsection and there is a demonstrated need for a policy to respond to aberrant utilization or provision of unnecessary tests." *Id.* § 4554(b)(4).

On March 10, 2000, the negotiated-rulemaking committee published for public comment new proposed regulations and NCDs. *See* 65 Fed.Reg. 13,082 (Mar. 10, 2000). With respect to its mandate to "consider the medical conditions for which a laboratory test is considered reasonable and necessary," the committee "reached consensus to outline the specific medical conditions for which a number of specific clinical laboratory services may be reasonable and necessary" and an "extensive list of tests" for which it believed that a national coverage determination "was appropriate." *Id.* at 13,085. But the rulemaking committee found that making precise determinations as to when thousands of laboratory tests are and are not reasonable and necessary was a task that was easier for Congress to assign than for the committee to accomplish. It therefore stressed that its inclusion of a diagnosis such as diabetes in the section addressing the diagnoses for which a test may be appropriate "*may* support medical necessity of the claim, but the claim *may* be

---

4.  A negotiated rulemaking is a process by which a committee of representatives of affected interests works with agency personnel

and a facilitator to develop a consensus policy.

subject to review to determine whether the test was *in fact* reasonable and necessary in the *particular* circumstances presented." *Id.* at 13,086 (emphasis added). With regard to the use of the word "may," the rulemaking committee explained as follows:

A national coverage policy is neither a practice parameter nor a statement of the accepted standard of medical practice. Words such as "may be indicated" or "may be considered medically necessary" are used for this reason. Where a policy gives a general description and then lists examples (following words like "for example" or "including"), the lists of examples is not meant to be all inclusive but merely to provide some guidance.

*Id.* at 13,095. In other words, the local contractors were expected to continue to exercise their medical judgment to make medical-necessity determinations on individual claims. The committee further emphasized that the "entity submitting a claim is responsible for documentation of medical necessity of the services to justify and support Medicare payment of the claim." *Id.* at 13,088.

### b. *The Proposed NCD for Blood Glucose Tests*

The portion of the proposed NCD dealing specifically with blood glucose tests appears at 65 Fed.Reg. 13,127–31. The proposed NCD indicated that diabetes was a diagnosis for which blood glucose tests may be warranted. *Id.* at 13,128. But nothing in the proposed NCD said anything, one way or the other, about how much physician involvement was required to establish that repeated tests were reasonable and necessary. That judgment was to be left to the informed discretion of the Medicare contractors.

Blood glucose tests were therefore one of the many areas for which the proposed NCD was not intended to set a definitive "practice parameter" or make a "state-ment of the accepted standard of medical practice." *Id.* at 13,095. Rather, it was an instance in which the list of examples was "not meant to be all inclusive but merely to provide some guidance" to local contractors in making individual claims determinations. *Id.*

### c. *Defendant's Program Guidance on Blood Glucose Tests and Medical Necessity*

As discussed earlier, section 410.32(a) provides, in general, that laboratory tests are not reasonable and necessary for purposes of Medicare reimbursement unless the treating physician "uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). Plaintiffs do not dispute Defendant's authority to adopt or apply this requirement. The criteria of section 410.32(a) have been interpreted in Defendant's program guidance, including program memoranda issued in late 2000. (See A.R. at 264) (Transmittal AB–00–99 at 1 (Oct. 24, 2000), and Transmittal AB–00–108 at 1 (Dec. 1, 2000).).

Transmittal AB–00–108 has particular relevance here. It reviewed Medicare coverage and payment policy for SNF patients whose stays were not covered by Medicare Part A but who were eligible for services under Part B, the situation at issue in the instant matter. (See A.R. at 264 (Transmittal AB–00–108 at 1).) The transmittal states that "[i]f a physician separately orders the performance of a glucose monitoring service for a patient who can not self-administer, clinical staff generally will administer a glucose monitoring service along with their other duties." (*Id.*) The relevant remainder of Transmittal AB–00–108 goes on to state as follows:

Sections 42 C.F.R. 410.32 and 411.15 specify that for a laboratory service to be reasonable and necessary, it must not

only be ordered by the physician but the ordering physician must also use the result in the management of the beneficiary's specific medical problem. *Implicitly, the laboratory result must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care; this includes the physician's order for another laboratory service.* Compliance program guidance for laboratory services sets forth conditions under which a physician's order for a repeat laboratory service can qualify as an order for another covered laboratory service. *A standing order is not usually acceptable documentation for a covered laboratory service.*

(A.R. at 265) (emphasis added). Transmittal AB–00–108 further recognized that the policy was consistent with the proposed NCD then pending and advised contractors to "review their local coverage policy for glucose testing in light of the proposed national coverage policy" and "clarify, if necessary, that a glucose monitoring laboratory service must be performed in accordance with laboratory service coverage criteria including the order and clear use of a laboratory result prior to a similar subsequent laboratory order to qualify for separate payment under the Medicare laboratory benefit." *Id.*

It should be noted that Defendant's policy guidance is mentioned in multiple Medicare program manuals. The Medicare Benefit Policy Manual provides that "clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a)." (Def.'s Ex. 4 (Medicare Benefit Policy Manual, ch. 15, § 80.1).) In addition, the Medicare Claims Processing Manual states that "[r]outine glucose monitoring of diabetes is never covered in an SNF, whether the beneficiary is in a covered Part A stay or not," but rather a blood glucose test "may only be covered when it meets all the conditions of a covered laboratory service, including use by the physician in modifying the patient's treatment." (*Id.* (Medicare Claims Processing Manual, ch. 7, § 90.1).)

### d. Mutual of Omaha's 2001 Local Coverage Determination

Pursuant to Defendant's transmittal instructions, Mutual of Omaha published an LCD on blood glucose tests on its website in 2001. It adopted verbatim the language in the "Indications" and "Limitations" sections of the proposed NCD on blood glucose tests. (A.R. at 106–07 (Local Coverage Determination for Blood Glucose Testing (L19657) ("Retired LCD") at 4–5).) In a segment captioned "Utilization Guidelines," the LCD quoted and paraphrased at length from the proposed NCD and Transmittal AB–00–108 and then stated as follows:

Lack of documentation of prompt notification of the physician (prompt notification would be the anticipation that the physician would be notified prior to the next blood glucose monitoring with the possible adjustment of medication) would not be considered reasonable and necessary and would not be considered for separate payment. Routine monitoring per accucheck of blood sugars done daily, weekly or intermittently without signs or symptoms and/or without physician notification would not be considered reasonable or necessary and would not be considered for separate payment.

(A.R. at 116.)

### e. The Final NCD and Retirement of the LCD

On November 23, 2001, a final NCD on laboratory tests was published in the Federal Register, effective November 25, 2002. Medicare Program: Negotiated Rulemaking: Coverage and Administrative Policies for Clinical Diagnostic Laboratory Ser-

vices, 66 Fed.Reg. 58,788 (Nov. 23, 2001). The final NCD on blood glucose tests was identical to the language in the proposed NCD. *Id.* at 58,846–50. That portion of the NCD was then incorporated as section 190.20 of the Medicare National Coverage Determinations Manual and published on the CMS webpage.

With particular respect to limitations on the frequency of testing, the negotiated rulemaking committee reiterated that it had "agreed to set as its goal the development of specific language on frequency limitations for the various national coverage policies drafted whenever possible to promote uniformity throughout the country" and stated that it "spent a great deal of time and worked very diligently on this issue." *Id.* at 58,802. Nonetheless, committee members remained "unable to reach a consensus on specific frequency limitations for most of the proposed national coverage policies." *Id.* The committee therefore "decided to defer to local contractors in this regard" and stressed that "[i]n the absence of a national coverage policy on a particular laboratory procedure that specifies a frequency limitation, Medicare's local contractors are responsible for making individual coverage determinations on the procedure, including, if they choose, establishing appropriate local frequency limitations on the procedure." *Id.* The final NCD, however, did nothing to change any standards regarding the reporting of test results to the physician or regarding the physician's use of the results to order new tests and to manage the patient's condition. Like the proposed NCD, the final NCD simply ratified the "longstanding" interpretations of Defendant on these matters. *Id.* at 58,-848.

With the issuance of the final NCD, Mutual of Omaha's LCD no longer served the limited purpose of adopting, on an interim basis, the proposed NCD, and it was subsequently retired. (A.R. at 118 (Retired LCD at 16).) Mutual of Omaha stated that the LCD "is retired based on subsequent issuance of an NCD by CMS on the same subject matter," that the retirement "will have no effect on the manner in which Mutual of Omaha currently processes medical reviews or conducts appeals on blood glucose monitoring," and that the intermediary "will continue to apply the medical necessity guidelines" in CMS program memoranda. (*Id.*)

### f. The New Regulation Effective January 1, 2007

Effective January 1, 2007, Defendant adopted a new regulation on blood glucose testing, 42 C.F.R. § 424.24(f). In full, the new regulation provides as follows: "For each blood glucose test, the physician must certify that the test is medically necessary. A physician's standing order is not sufficient to order a series of blood glucose tests payable under the clinical laboratory fee schedule." 42 C.F.R. § 424.24(f).

### 4. Plaintiffs' Claims for Reimbursement

As indicated, Plaintiffs are three SNFs which provided services to twelve beneficiaries whose nursing home stays were not covered by Medicare Part A but who were eligible for coverage of certain services under Medicare Part B. The blood glucose tests at issue in this case were performed from October 1, 2005, through October 31, 2005. (A.R. at 32.) As noted: the testing was performed by Plaintiffs' respective nursing staffs, using hand-held monitoring devices designed for home use, not by an outside laboratory or treating physicians (A.R. at 40, 2480); when Plaintiffs submitted claims for payment of those tests, Mutual of Omaha denied the claims (A.R. at 31); Maximus upheld Mutual of Omaha's determination on appeal (*id.*); and Plain-

tiffs sought review before an ALJ who conducted hearings on July 17, 2007 (A.R. at 32).

Evidence presented to the ALJ showed that each beneficiary's attending physician wrote an order for blood glucose testing using the "finger-stick method." (A.R. at 38.) The orders established patient-specific sliding scales. (A.R. at 38, 151.) The orders required grossly aberrant results to be reported to the physician, thereby providing for prompt notification only "[i]f the level is significantly higher or lower, so as to place the patient at serious medical risk." (See Compl. ¶ 14.) Routine, non-aberrant results were not reported to the physician; instead, those results would be reviewed by the attending physician, if they were reviewed at all, at the physician's next visit with the beneficiary, which occurred approximately every one or two months. (A.R. at 40, 77.)

The ALJ ruled against Plaintiffs' claims for reimbursement in decisions dated August 9, 2007. (See A.R. at 31–42.) In concluding that the challenged testing performed in October of 2005 was not covered, the ALJ said essentially five things. First, the ALJ concluded that the operative regulation, section 410.32(a), "which provides for physician's use of the tests to manage the beneficiary's specific problem, prohibits coverage for routine blood glucose monitoring." (A.R. at 39.) Second, the ALJ found support for this conclusion in both the Medicare Claims Processing Manual and the Medicare Benefit Policy Manual. (*Id.*) Third, the ALJ cited and relied upon Transmittal AB–00–108, particularly its policy that, "[i]mplicitly, the laboratory result must be reported to the physician promptly" and that "[a] standing order is not usually acceptable documentation for a covered laboratory service." (*Id.*) Fourth, the ALJ noted that the final NCD "does not conflict with the aforementioned policy ... or purport to supercede

the requirements set out in [section] 410.32[ (a) ] or the ... manual provisions." (*Id.* at 39–40.) And fifth, the ALJ found support in a decision of the Departmental Appeals Board ("DAB"), *In re CMS LCD Complaint: Local Coverage Determination: Blood Glucose Testing: LCD L 1316 (Lillian Spooner and Delores Shaw)*, DAB Decision No. CR 1548 (Dec. 22, 2006) (hereinafter, "*In re CMS LCD Complaint,* DAB Decision No. CR 1548"). (*Id.* at 40.) The DAB is responsible for reviewing a host of decisions within the HHS's programs and its jurisdiction includes challenges to the reasonableness of LCDs. See 42 C.F.R. §§ 426.465, 426.490.

As a result of these findings, the ALJ further concluded that Plaintiffs, as Medicare providers, were financially liable for the costs of the tests. (A.R. at 41.) In support of this further conclusion, the ALJ noted that, pursuant to 42 C.F.R. § 411.406(e), a Medicare provider "may be deemed to have constructive notice of noncoverage based on the receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries [or] carriers." (*Id.*) Plaintiffs, as the service providers, the ALJ continued, were "presumed to have knowledge of the rules and procedures of Part B based on the widely published CMS manuals and readily available regulations" and, hence, were "liable for the blood glucose monitoring furnished [in] October [of] 2005." (*Id.*)

In its decisions dated February 19, 2008, the MAC concluded that the ALJ's decisions were "based on a correct evaluation of the applicable legal authorities and evidence in the record." (A.R. at 4.) Accordingly, as indicated, the MAC adopted the ALJ's decisions (*id.*), thereby prompting the instant lawsuit. In essence, Plaintiffs seek to reverse the coverage decisions with respect to the testing performed on the

twelve patients in October of 2005. However, Plaintiffs also seek to declare invalid—and therefore be reimbursed for—the denied claims for all of their similarly situated patients between November 1, 2005, and December 31, 2006, *i.e.*, the date before the new blood glucose testing regulation, 42 C.F.R. § 424.24(f), took effect.

### B. ANALYSIS

The parties' cross-motions center on essentially eight arguments raised by Plaintiffs: (1) that Defendant's denial of reimbursement for the blood glucose tests violates the operative regulation, section 410.32(a); (2) that the standard imposed by the ALJ in her decisions was an "illegally adopted rule"; (3) that the ALJ's decisions conflicted with the final NCD on blood glucose testing; (4) that the ALJ improperly relied on an administrative decision in an LCD case; (5) that the ALJ failed to consider certain evidence, particularly the "fact" that the so-called "promptness" requirement was actually satisfied; (6) that Defendant violated Plaintiffs' equal protection rights; (7) that Defendant erred by concluding that Plaintiffs had constructive notice that the tests were not covered; and (8) that the relief Plaintiffs seek is appropriate. The court considers the arguments in turn.

### 1. *Whether Defendant Violated Section 410.32(a)*

■ According to Plaintiffs, the controlling regulation—section 410.32(a)—does not use the word "promptly" in connection with physician notification for diagnostic laboratory testing and, hence, Defendant's failure to reimburse Plaintiffs for not promptly notifying physicians was a direct violation of that regulation. In the court's view, Plaintiffs' first argument is technically accurate but, nonetheless, unconvincing. As noted, the Medicare Act authorizes payment under Medicare Part B for "medical and other health services," including "diagnostic laboratory tests," but only if such services are "reasonable and necessary for the diagnosis of treatment or illness." 42 U.S.C. §§ 1395k(a)(1), 1395x(s)(3), 1395y(a)(1)(A). The implementing regulation, section 410.32(a), in turn, provides in pertinent part as follows:

> All ... diagnostic laboratory tests ... must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary.

42 C.F.R. § 410.32(a). In other words, section 410.32(a) requires that blood glucose tests be ordered by the patient's treating physician and that the physician use the results in the management of the patient's care. However, as Plaintiffs argue, it does not say anything about prompt notification.

There are, however, at least three reasons why Plaintiffs' initial argument falls short. First, Defendant's interpretation of the regulation is amplified in Transmittal AB–00–108 which "sets out CMS policy for laboratory/diagnostic testing coverage." As indicated, Transmittal AB–00–108 provides that, "[i]mplicitly, the laboratory results must be reported to the physician promptly in order for the physician to use the result and instruct continuation or modification of patient care." The transmittal also makes clear that "[a] standing order is not usually acceptable documentation for a covered laboratory service."

To be sure, Transmittal AB–00–108 is not iron-clad. For example, it does not explicitly mandate physician notification in all situations; indeed it emphasizes the words "implicitly" and "usually." More-

over, it does not define what "prompt" means or whether prompt reporting might be satisfied if there is an aberrant result. However, the ALJ's reading of the transmittal is certainly supportable. And most importantly, the court cannot say that the ALJ's reliance on the transmittal—to conclude that prompt reporting was required for the claims at issue—was in any way arbitrary, capricious, an abuse of discretion, or contrary to law.

Second, putting the transmittal aside, Defendant's interpretation of section 410.32(a)—*i.e.*, that it can be read to require prompt notification—is supported by the Medicare program manuals. For example, the Medicare Benefit Policy Manual provides that "clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in [section] 410.32(a)." Similarly, the Medicare Claims Processing Manual, with specific reference to coverage criteria for blood glucose testing, provides that "[r]outine glucose monitoring is never covered in an SNF, whether the beneficiary is in a covered Part A stay or not," but rather a blood glucose test "may only be covered when it meets all the conditions of a covered laboratory service, including use by the physician in modifying the patient's treatment."

Third, Plaintiffs ignore the well-established rule that "substantial deference" must be given to an agency's interpretation of its own regulations, particularly Defendant's interpretation of Medicare regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). As recently as last year, the Supreme Court explained that "[j]ust as we defer to an agency's reasonable interpretations of the statute when it issues regulations in the first instance, the agency is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in

force." *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 128 S.Ct. 1147, 1155, 170 L.Ed.2d 10 (2008). *See also South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir.2002) ("Where Congress has entrusted rulemaking and administrative authority to an agency, courts normally accord the agency particular deference in respect to the interpretation of regulations promulgated under that authority."). This deference is further heightened when the regulation concerns the Medicare Act and its administratively-complex programs. *See, e.g., Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381; *South Shore Hosp., Inc.*, 308 F.3d at 97 (and cases cited therein). Accordingly, the court has little choice but to defer to Defendant's interpretation as outlined in Transmittal AB–00–108 and the manuals. Simply put, Plaintiffs are not able to surmount the steep standard of review required for this appeal to succeed.

### 2. Whether the "Standard" Imposed by the ALJ was an "Illegally Adopted Rule"

Plaintiffs' second argument is as follows: because Mutual of Omaha, prior to October 1, 2005, ostensibly permitted reimbursement for the very types of blood glucose tests at issue in this case, Defendant's decision to stop doing so on October 1, 2005, via the "standard" imposed by the ALJ in her decisions—a standard that Plaintiffs assert included no prior notice or public comment—"represents the imposition of a new, substantive standard that was never adopted under formal rulemaking ... and therefore is void." (Document No. 14 ("Pls.' Brief") at 5–6.) This makeweight argument has little traction.

Most notably, Plaintiffs fail to demonstrate how an administrative law judge's *decision* can morph into an agency's rule *standard*. They certainly cite no case law

to that effect. Nor do Plaintiffs demonstrate how Defendant's position in this regard was arbitrary, capricious, an abuse of discretion, or contrary to law.

Nonetheless, Defendant, taking Plaintiffs' bait, acknowledges that the APA generally requires that an agency engaged in rulemaking publish a general notice and allow for public comment. *See* 5 U.S.C. §§ 553(b), (c). But, Defendant continues, the APA specifically exempts "interpretive rules" from the notice-and-comment process. *Id.* § 553(b)(A).

■ The court agrees with Defendant that, even if the "standard" imposed by the ALJ somehow rises to the level of a rule, it is an interpretive rule, not a substantive rule and, hence, required no notice-and-comment proceedings. *See La Casa Del Convaleciente v. Sullivan,* 965 F.2d 1175, 1178 (1st Cir.1992) ("A substantive rule 'has the force of law,' while an interpretive rule is 'merely a clarification or explanation of an existing statute or rule' and is 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' ") (quoting *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.,* 589 F.2d 658, 664–65 (D.C.Cir. 1978)). *See also Guernsey Mem'l Hosp.,* 514 U.S. at 99, 115 S.Ct. 1232 (noting that interpretive rules are rules "issued by an agency to advise the public of the agency's construction of the statutes and rules

which it administers"). For one thing, the ALJ simply followed Transmittal AB–00–108 which explained how Defendant construed the terms of section 410.32(a) without adding any additional obligations. Moreover, the ALJ's "standard" was echoed by Defendant's program manuals. *See, e.g., Guernsey Mem'l Hosp.,* 514 U.S. at 99, 115 S.Ct. 1232 (finding that a provision in the Medicare Provider Reimbursement Manual is an interpretive rule); *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson,* 447 F.3d 68, 77 (1st Cir. 2006) (similar). It is also important that Transmittal AB–00–108 was not " 'inconsistent with any of [Defendant's] existing regulations,' " *Iacaboni v. United States,* 251 F.Supp.2d 1015, 1039 (D.Mass.2003) (quoting *Guernsey Mem'l Hosp.,* 514 U.S. at 100, 115 S.Ct. 1232), and was adopted in a program memorandum which does not have the force and effect of law, *Erringer v. Thompson,* 371 F.3d 625, 630–32 (9th Cir.2004).[5]

### 3. Whether the ALJ's Decisions Conflicted with the Final NCD on Blood Glucose Testing

■ Third, Plaintiffs assert that the requirement of "prompt" report and usage of blood glucose test results is inconsistent with the final NCD which, as indicated, became effective on November 25, 2002, and was identical to the language in the earlier proposed NCD. According to Plain-

---

**5.** To be sure, the APA sometimes requires an agency to engage in notice-and-comment proceedings when the agency changes its longstanding interpretive rules, *see, e.g., Paralyzed Veterans of Am. v. D.C. Arena,* 117 F.3d 579, 586 (D.C.Cir.1997), but Plaintiffs fail to identify any change by Defendant of its position here. It is not enough for Plaintiffs to allege that the fiscal intermediary, Mutual of Omaha, did not faithfully apply Defendant's position for a period of time prior to October of 2005. *See, e.g., id.* at 587 (holding that intermediary's failure to apply agency's policy

does not constitute an "authoritative departmental position"); *Heckler v. Cmty. Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 64–65 & n. 21, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (similar). Moreover, the obligation to engage in notice-and-comment rulemaking when an agency changes position "is implicated only when the disavowed interpretation was an authoritative one." *Ball Mem'l Hosp. v. Leavitt,* 2006 WL 2714920, at *7 (D.D.C. Sept. 22, 2006) (citations and internal quotation marks omitted). That is not the situation here.

tiffs, the ALJ's decisions violated the NCD which "specifically encouraged frequent monitoring of blood glucose levels." (Pls.' Brief at 12.) However, Plaintiffs' argument to the contrary, the NCD set no firm policy on blood glucose testing.

As indicated, the rulemaking committee responsible for drafting the NCD was "unable to reach a consensus on specific frequency limitations" for blood glucose testing and, instead, left it to local contractors such as Mutual of Omaha to make "individual coverage determinations on the procedure, including, if they choose, establishing local frequency limitations." 66 Fed.Reg. at 58,082. Accordingly, the final NCD did not change Defendant's existing policy regarding the reporting of test results or the physicians' use of the results to order new tests and to manage their patients' care. Instead, the NCD ratified Defendant's "longstanding policies" on this matter. *Id.* at 58,848.

Specifically, the final NCD, like the proposed NCD before it, stated as follows in the section entitled "Limitations":

Frequent home blood glucose testing by diabetic patients *should* be encouraged. In stable, non-hospitalized patients who are unable or unwilling to do home monitoring, it *may* be reasonable and necessary to measure quantitative blood glucose up to four times annually.

Depending on the age of the patient, type of diabetes, degree of control, complications of diabetes, and other co-morbid conditions, more frequent testing than four times annually *may* be reasonable and necessary.

In some patients presenting with non-specific signs, symptoms, or diseases not normally associated with disturbances in glucose metabolism, a single blood glucose test *may* be medically necessary. Repeat testing *may not* be indicated unless abnormal results are found or unless there is a change in clinical condi-

tion. If repeat testing is performed, a specific diagnosis code (e.g., diabetes) *should* be reported to support medical necessity. However, repeat testing may be indicated where results are normal in patients with conditions where there is a confirmed continuing risk of glucose metabolism abnormality (e.g., monitoring glucocorticoid therapy).

*Id.* at 58,846 (emphasis added). In other words, the NCD indicated that blood glucose tests were an area in which CMS did not intend to set a definitive "practice parameter" or make a "statement of the accepted standard of medical practice." 65 Fed.Reg. at 13,095. Rather, the NCD provided to local contractors making individual claims determinations a list of examples, for a wide range of patients, that was "not meant to be all inclusive but merely to provide some guidance." *Id.*

Perhaps most importantly, nothing in the final NCD even remotely suggested that it was intended to alter Defendant's existing guidance on the coverage of blood glucose testing. At bottom, therefore, it is quite easy to reconcile the final NCD with Transmittal AB–00–108. Both support the notion that Defendant encourages frequent blood glucose testing as needed, but with adequate supervision from a beneficiary's treating physician. Plaintiffs' third argument, therefore, fails to convince this court that the ALJ's decisions with respect to the NCD, or Defendant's actions in general, was arbitrary, capricious, an abuse of discretion, or contrary to law.

4. *Whether the ALJ Improperly Relied on an LCD Administrative Decision*

Plaintiffs' fourth argument can also be dealt with in relatively short order. In essence, they assert that, when ruling, the ALJ improperly cited a decision of the DAB, *In re CMS LCD Complaint*, DAB Decision No. CR 1548. As Defendant

points out, however, it is clear from even a cursory review of the record that the ALJ cited the particular DAB decision—which reviewed a challenge to an LCD issued by Blue Cross/Blue Shield of Tennessee governing coverage for blood glucose testing—merely as persuasive authority. (See A.R. at 40.) And there can be little question but that the decision was indeed instructive, *i.e.*, it provided that blood glucose testing would be covered by Blue Cross/Blue Shield in Tennessee only if "the physician is promptly informed of the result prior to the next testing episode." *In re CMS LCD Complaint* at 2. Nothing further on this point need be said.

    5.  *Whether the ALJ Failed to Consider Certain Evidence, Particularly the "Fact" that the So–Called "Promptness" Requirement was Actually Met*

■ As a fifth argument, Plaintiffs go beyond challenging the promptness requirement as a matter-of-law, and instead turn to the facts. Specifically, Plaintiffs assert that the ALJ failed to consider certain "undisputed medical evidence." Much of this argument, however, has no bearing on the legal questions currently at issue.[6]

Nonetheless, the court pauses to consider one particular argument Plaintiffs make in this regard, *i.e.*, that the "promptness" requirement was met as a matter-of-fact in all twelve cases from October of 2005 that the ALJ considered. (Pls.' Brief at 14–15.) As Defendant points out, "substantial evidence" shows otherwise. *See Chipman*, 90 F.3d at 422 (noting that if the ALJ's factu-

al decisions are supported by substantial evidence they may not be overturned).

■ First the law: Plaintiffs concede that, with their fact-based arguments, they bear the burden of showing that Defendant's decision was not based on substantial evidence. This is an exacting standard to meet. *See South Shore Hosp., Inc.*, 308 F.3d at 104 ("[S]ubstantial evidence is an objective standard that gives [Defendant] the benefit of the doubt as to disputed facts" and "[t]his sets the bar fairly low.") (citations and internal quotation marks omitted). Put differently, so long as Defendant provides " 'such relevant evidence as a reasonable mind might accept as adequate to support [her] conclusion,' " *Visiting Nurse Ass'n Gregoria Auffant, Inc.*, 447 F.3d at 72 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)), she will survive Plaintiffs' factual challenges "even if the evidence also might support some other, inconsistent conclusion," *South Shore Hosp., Inc.*, 308 F.3d at 104.

Now, the facts as to promptness: For the test patient (see n. 2, *supra*), the evidence showed that she "was under a standing order to undergo blood glucose testing twice daily" and that the physician was to be consulted only if her glucose levels exceeded 450. The evidence also showed that the patient's plan of care was "monitored daily by professional licensed nurses" and that the results were to be "reviewed monthly" by a physician. Moreover, and perhaps most importantly, there was no evidence that the patient's results

---

**6.** For example, Plaintiffs argue that the ALJ should have considered evidence that "[t]here is no generally accepted standard of medical practice that requires a physician to be notified of each blood glucose test result before another test may be administered," or that "[a] requirement that a physician be notified of each blood glucose test result before another test is administered, serves no medical

purpose and is practically unworkable." (Pls.' Brief at 7) (citing Pls.' Facts ¶¶ 20, 21.) However, as Defendant points out, such evidence is immaterial for purposes of resolving the legal issue here, whether the blood glucose testing was "reasonable and necessary" under 42 U.S.C. § 1395y(a)(1)(A) and the operative regulation, section 410.32(a).

were ever actually reported to or reviewed by a physician. (See Doc. No. 24, Mem. in Supp. of Def.'s Mot. Supp. J. and in Opp'n to Pls.' Mot. Summ. J. ("Def.'s Opening Brief") at 32.) Similar evidence existed for the other eleven cases too. (See *id.* at n. 13.) In short, the substantial evidence wholly supported the conclusion reached by the ALJ—and pursued by Defendant here—that the patients' test results were not promptly reported to their physicians, Plaintiff's present argument to the contrary.

### 6. Whether Defendant Violated Plaintiffs' Equal Protection Rights

Plaintiffs also raise two equal protection arguments. First, they contend that other fiscal intermediaries "would have allowed the blood glucose laboratory tests without imposing a requirement that each test be reviewed by the ordering physician before the physician may order a subsequent test." (Doc. No. 14, Mem. of Pls.' in Supp. of Their Mot. Summ. J. ("Pls.' Opening Brief") at 16.) Second, they allege that the ALJ's decisions discriminate against the types of facilities at issue here— SNFs—because tests performed at outside laboratories would have been reimbursed despite the lack of prompt physician reporting. (*Id.* at 16–17.) In this court's view, neither argument carries sufficient weight to overcome Defendant's motion for summary judgment.

■■■■■ Plaintiffs concede that Defendant's Medicare policies are subject to "rational basis" equal protection review. Accordingly, the court must uphold the policies "as long as the means chosen by [Defendant] are rationally related to some legitimate government purpose." *Wine & Spirits Retailers, Inc. v. Rhode Is.*, 418 F.3d 36, 53 (1st Cir.2005). Put differently, Defendant's policies "bear a strong presumption of validity" which Plaintiffs may overcome "only by demonstrating that

there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." *Id.* (citations and internal quotation marks omitted). With these standard in mind, the court will address Plaintiffs' two equal protection arguments.

■■■■ As for Plaintiffs' first argument— alleged impermissible discrimination based on the fact that Mutual of Omaha was the fiscal intermediary here—this court believes that no possible equal protection violation exists. As Defendant points out, "[d]istributing ... Medicare benefits is a massive undertaking which 'requires Congress to make many distinctions among classes of beneficiaries while making allocations from a finite fund.'" *Minnesota Senior Federation, Metropolitan Region v. United States*, 273 F.3d 805, 808 (8th Cir.2001) (quoting *Bowen v. Owens*, 476 U.S. 340, 345, 106 S.Ct. 1881, 90 L.Ed.2d 316 (1986)). Thus, it is a necessary and appropriate consequence that different fiscal intermediaries may reach different conclusions with respect to different beneficiaries' claims at the initial level. Efficiency demands that this is an entirely rational approach to the administration of Medicare. Indeed, such distinctions are embedded in the statute itself. *See, e.g.,* 42 U.S.C. § 1395ff(c)(3) (authorizing individual contractors to make initial determinations on payment claims) and § 1395ff(f)(2)(B) (defining LCDs to include policy statements "by a fiscal intermediary or a carrier ... respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis ... in accordance with 42 U.S.C. § 1395y(a)(1)(A))."

Moreover, Defendant cites a string of decisions which, together, indicate that Plaintiffs' first equal protection argument carries little weight. *See, e.g., Estate of*

*Landers,* 545 F.3d at 112 (recognizing "CMS's legitimate interest in administrative efficiency"); *Ellis v. Apfel,* 147 F.3d 139, 145 (2d Cir.1998) ("A presumption which serves administrative convenience" provides a legitimate purpose for rational basis review); *Connecticut State Dep't of Social Servs. v. Thompson,* 242 F.Supp.2d 127, 161 (D.Conn.2002) (noting that "the rationale for permitting [a] ... provider chain to choose to file claims with the regional intermediary where the provider has its home office furthers the effective and efficient administration of the Medicare program" and that "[t]here can be little serious dispute therefore that [Defendant]'s actions are rationally related to the legitimate purpose of ensuring the effective and efficient administration of the Medicare program") (citation omitted), *rev'd on other grounds,* 428 F.3d 138 (2d Cir.2005). And Plaintiffs, by contrast, cite no case law upholding any equal protection challenge targeting differing decisions by different fiscal intermediaries.

■■■ This court also believes that no equal protection violation exists with regard to Plaintiffs' second argument, that the ALJ's decisions impermissibly discriminate against SNFs. For one thing, Plaintiffs again cite no case law supporting their position; the lone case they mention on this point, *Mayburg v. Sec'y of Health & Human Servs.,* 740 F.2d 100 (1st Cir.1984), does not mention equal protection concerns. Even more importantly, however, Plaintiffs ignore the fact that the operative regulation at issue in the ALJ's decisions here—section 410.32(a)—applies to *all* diagnostic laboratory testing, whether the services are performed in an SNF or at an outside laboratory facility. *See* 42 C.F.R. § 410.32(a). *See also* Transmittal AB–00–108 at 3 (noting that for an outside laboratory service to be reasonable and necessary, it "must be reported to the physician promptly"). In addition, Defendant has demonstrated how SNF's may rationally be

treated differently; *e.g.,* she notes that "routine blood glucose monitoring" at SNFs are "already encompassed as part of the Part A Medicare payment" (Def.'s Brief at 38–39 (citations omitted).) Finally, other courts have recognized that it is rational to draw distinctions in coverage based on the facility in which services are covered. See, *e.g., Gary Gibbon, M.D., Inc. v. Thompson,* 121 Fed.Appx. 703, 705 (9th Cir.2005) (finding rational basis for distinguishing between "respiratory patients who are in hospitals and skilled nursing facilities" and "respiratory patients ... who are in board-and-care facilities"); *Landers,* 2006 WL 2560297, at *14 (finding rational basis for distinguishing between two groups of SNF patients based on how much time they spent in a hospital prior to their transfer to an SNF), *aff'd,* 545 F.3d 98 (2d Cir.2008).

### 7. Whether Defendant Erred by Concluding that Plaintiffs had Constructive Notice that the Tests were not Covered

As indicated, the ALJ also concluded that Plaintiffs had "constructive notice" of their financial liability since, according to 42 C.F.R. § 411.406(e), they were "presumed to have knowledge of the rules and procedures of Part B based on the widely published CMS manuals and readily available regulations." (A.R. at 41.) As a seventh argument, Plaintiffs claim this conclusion was not supported by substantial evidence, *i.e.,* they were entitled to a "waiver of liability." Defendant, unsurprisingly, disagrees. Once again, the court finds Defendant's argument more persuasive.

The Medicare Act states that a provider may avoid payment for a disputed claim if it "did not know, and could not reasonably have been expected to know, that payment [by Medicare] would not be made" for the

services. 42 U.S.C. § 1395pp(a)(2). The governing regulation, in turn, provides several ways in which a provider might have constructive knowledge of non-payment. *See* 42 C.F.R. § 411.406(e). In particular, subsection (1) states that constructive knowledge will be presumed where "[i]t is clear that the provider ... could have been expected to have known that the services were excluded from coverage on the basis of ... [i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs." *Id.,* § 411.406(e)(1).

■ Here, Plaintiffs do not dispute that they knew of the widely-published CMS manuals as well as Transmittal AB–00–108, both of which indicated that prompt reporting of blood glucose testing to physicians could be deemed necessary. (See discussion, *supra.*) Indeed, they fail to even acknowledge, let alone discuss, the manuals or transmittal or even the statute or regulation. Moreover, the only case they cite, *Yale–New Haven Hosp., Inc. v. Thompson,* 162 F.Supp.2d 54, 68 (D.Conn. 2001) is easily distinguishable, both procedurally (the court was merely testing the sufficiency of the complaint via a Rule 12(b)(6) motion) and on its facts (the court noted that "the intermediaries continued to pay for [the disputed] services [there] for a period of eight years after the manual provision was disseminated"). In short, the court finds that the ALJ's constructive notice conclusion was supported by substantial evidence and was neither arbitrary, capricious, an abuse of discretion, or contrary to law. *See also Maximum Comfort, Inc. v. Sec'y of Health & Human Servs.,* 512 F.3d 1081, 1088 (9th Cir.2007) (indicating that review of an administrative law judge's constructive notice decision is "highly deferential").

8. *Whether the Relief Plaintiffs Seek is Appropriate*

As a final issue, the parties address whether the relief Plaintiffs seek is appropriate. In this court's view, the issue of relief need not be reached since, as indicated, this court believes that none of Plaintiffs' other arguments ought to succeed. However, assuming that analysis of the relief question becomes necessary, this court agrees with Defendant that Plaintiffs seek relief that is too broad.

Specifically, Plaintiffs ask the court to do two things: (1) reverse the coverage decisions with respect to the twelve patients whose claims arose in October of 2005; and, sweepingly, (2) apply that reversal to all blood glucose testing claims that thereafter arose both at Plaintiffs' facilities and elsewhere between November 1, 2005, and December 31, 2006, the day before the new regulation, 42 C.F.R. § 424.24(f), took effect. (See Doc. No. 13, Mot. of Pls.' for Summ. J. at 7–8; Pls.' Opening Brief at 19.) It is the second request that goes too far.

■ As Defendant argues, the fundamental error in Plaintiffs' second request is its failure to recognize that the court's authority to enter a remedial order is narrowly limited by the nature of the grant of subject matter jurisdiction (and attendant waiver of sovereign immunity) contained in 42 U.S.C. § 1395ff. Under that provision, any dissatisfied individual is entitled only of "judicial review of [Defendant]'s final decision," 42 U.S.C. § 1395ff(b)(1)(A), *i.e.,* only of claims that are "exhausted," *see Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 12, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) (noting that plaintiffs must exhaust the claims process through which "all aspects:" or a "present or future claim" for Medicare benefits must be "channeled"); *Puerto Rican Ass'n of Physical Med. & Rehab., Inc. v. United*

*States*, 521 F.3d 46, 49 (1st Cir.2008) (applying exhaustion requirement to Part B claims). Because Plaintiffs' far-reaching second request goes beyond the narrow one-month claims of the twelve patients that have been exhausted, they are not entitled, in the court's opinion, to any relief beyond those parameters. *See Abington Mem'l Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir.1984) (refusing to enter far-reaching order vacating policy and recognizing that specific relief must be limited to the particular reimbursement claims submitted).

### IV. CONCLUSION

Having carefully scoured the record, the proceedings below, and the arguments raised in this court, the court believes that Defendant's decisions, denying reimbursement for the Medicare claims at issue, were not arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law. Accordingly, the court recommends that Plaintiffs' motion for summary judgment be DENIED and that Defendant's cross-motion for summary judgment be ALLOWED.[7]

DATED: June 30, 2009

7. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.